UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BERKSHIRE HATHAWAY HOMESTATE INS. CO.,<br><br>                         Plaintiff,<br><br>         v.<br><br>SQI, INC., et al.,<br><br>                         Defendants. | CASE NO. C14-0868JLR<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO STRIKE AND MOTION FOR LEAVE TO FILE A SURREPLY |

## INTRODUCTION

Before the court are Plaintiff Berkshire Hathaway Homestate Insurance Company, formerly known as Cornhusker Casualty Company's ("Cornhusker"), motion for summary judgment (Mot. (Dkt. #29)); Defendants SQI, Inc. ("SQI"), Ledcor Industries (USA), Inc. ("Ledcor"), and Admiral Way, LLC's ("Admiral") combined motion to strike and opposition memorandum (Resp. (Dkt. # 31)); Cornhusker's reply memorandum (Reply (Dkt. # 35)); and Defendants' motion for leave to file a surreply

1   (Mot. for Surreply (Dkt. # 39)).  The court has considered the parties' submissions, the

2   balance of the record, and the relevant law, and has heard oral argument.  Being fully

3   advised, the court grants in part and denies in part Cornhusker's motion for summary

4   judgment and denies Defendants' motion to strike and motion for leave to file a surreply.

5                                   **BACKGROUND**

6          This is a declaratory judgment action and insurance coverage dispute arising out of

7   underlying construction defect litigation.  Cornhusker moves for summary judgment on

8   its request for a declaration that it has no obligation to indemnify or pay benefits to SQI

9   or its assignees with respect the underlying litigation.  (*See* Mot. at 1-2.)  Defendants

10  oppose Cornhusker's motion and request that the court either strike the motion or grant

11  summary judgment in SQI's favor.  (*See* Resp. at 1-2.)

12         The case has its origins in a construction project in West Seattle.  In 2001,

13  developer Admiral hired Ledcor as the general contractor to build the Admiral Way

14  Project ("the Project"), a structure consisting of 65 residential units, two ground-floor

15  commercial units, and an underground parking garage.  (*See id.* at 2; Mot. at 4; 1st

16  Sparling Decl. (Dkt. # 30) ¶ 5, Ex. D ("Project CCRs") ¶ 3.1; *see also* Martens Decl.

17  (Dkt. # 33) ¶ 5, Ex. D ("Gartin Decl.") ¶¶ 2, 4.)  Ledcor in turn hired multiple

18  subcontractors.  (Resp. at 2; Sparling Decl. ¶ 8, Ex. G ("Ledcor Compl.") ¶ 12; *see also*

19  Gartin Decl. ¶ 4.)  One of those subcontractors was SQI, which Ledcor hired to do the

20  roofing on the Project.  (Resp. at 2; Ledcor  Compl. ¶¶ 12-13.)  In addition to working on

21  the original roofing, SQI also performed repairs on the roof in May and June of 2005.

22  (Resp. at 3; *see* Gardner Decl. (Dkt. # 32) ¶¶ 2-4, Exs. 1-3.)

From May 2003 through May 2006, SQI had three year-long commercial general

liability ("CGL") insurance policies with Cornhusker.  (Resp. at 2-3; *see* Martens Decl.

¶¶ 2-4, Exs. A-C; 2d Sparling Decl. (Dkt. # 36) ¶¶ 3-5, Exs. B ("1st Policy"), C ("2d

Policy"), D ("3d Policy").   The policies provided coverage for "Bodily Injury and

Property Damage Liability" (Coverage A)[1]; "Personal and Advertising Injury Liability"

(Coverage B); and "Medical Payments (Coverage C).  (1st Policy at 92-102; 2d Policy at

31-41; 3d Policy at 32-42[2].)  In addition, SQI paid extra premiums for products-

completed operations hazard ("PCOH").[3]  (1st Policy at 11; 2d Policy at 15; 3d Policy at

---

[1] Under Coverage A, Cornhusker agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  (1st Policy at 92; 2d Policy at 31; 3d Policy at 32.)  Cornhusker agreed to pay for bodily injury and property damage, however, only if "(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place within the 'coverage territory,' and (2) The 'bodily injury' or 'property damage' occurs during the policy period."  (1st Policy at 92; 2d Policy at 31; 3d Policy at 32.)  Moreover, such coverage is subject to the exclusions included under part 2 of Coverage A.  (1st Policy at 92-97; 2d Policy at 31-36; 3d Policy at 32-37.)

In addition, the amount that Cornhusker agreed to "pay for damages is limited as described in SECTION III – LIMITS OF INSURANCE."  (1st Policy at 92; 2d Policy at 31; 3d Policy at 32.)  Section III states, "The Limits on Insurance in the Declarations and the rules below fix the most we will pay . . . .  The General Aggregate Limit is the most we will pay for the sum of: . . . Damages under Coverage A, except damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.' . . . The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.'"  (1st Policy at 104; 2d Policy at 43; 3d Policy at 44.)

[2] When referencing specific pages of SQI's policies, the court will use the exhibit page number found in the lower right corner of the page rather than the blue CM/ECF page number or the page number for the original document.

[3] SQI paid an additional $12,066.00 in 2003-04, an additional $16,591.00 in 2004-05, and an additional $14,911.00 in 2005-06.  (1st Policy at 11; 2d Policy at 15; 3d Policy at 12.)  For those premiums, Cornhusker provided a $1,000,000.00 PCOH Aggregate Limit.  (1st Policy at 11; 2d Policy at 15; 3d Policy at 12.)

12.)  PCOH provisions apply to bodily injury or property damage that arises out of the insured's completed work or product as opposed to its ongoing operations.[4]  *See Goodwin v. Wright*, 6 P.3d 1, 4 (Wash. Ct. App. 2000).  In addition, all three of SQI's policies were subject to an endorsement that added an exclusion for residential construction under Coverage A.[5]  (1st Policy at 116; 2d Policy at 55; 3d Policy at 57.)

On August 6, 2002, Admiral recorded the "DECLARATION AND COVENANTS, CONDITIONS, RESTRICTIONS, AND RESERVATIONS For The Admiral[,] A Condominium" ("Project CCRs"), establishing the structure of the ownership rights in the Project.  (*See* Project CCRs.)  The Project CCRs identify the units

---

[4] SQI's policies define PCOH as "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work,'" with a series of limitations.  (1st Policy at 109; 2d Policy at 48; 3d Policy at 49.)

[5] The residential construction exclusion reads, in pertinent part, as follows:  "This insurance does not apply to 'bodily injury' or 'property damage' resulting from or arising out of 'residential construction', [sic] . . . . For purposes of this endorsement, 'residential construction' means work or operations of any nature or extent on, with respect to, or in support of structures intended for human habitation, including but not limited to houses, apartments, condominiums, or townhouses."  (1st Policy at 116.)
"This insurance does not apply to 'bodily injury' or 'property damage' resulting from or arising out of 'residential construction', [sic] . . . . For purposes of this endorsement, 'residential construction' means work or operations of any nature or extent on, with respect to, or in support of structures intended for human habitation, including but not limited to 'condominiums.' 'Residential construction' does not include, however, . . . 'apartments.'  'Condominiums' means structures whereby separate parts of the structure may be owned individually by separate owners and the underlying property is owned in common by all the separate owners together. . . . 'Apartments' means structures containing more than one single-family dwelling where the owner of the structure owns each dwelling together with the underlying property."  (2d Policy at 55.)
"This insurance does not apply to 'bodily injury' or 'property damage' resulting from or arising out of the original construction, in whole or in part, of condominiums . . . . This exclusion does not apply to the remodeling or repair of any existing structure . . . ."  (3d Policy at 57.)
In each of SQI's policies, the residential construction exclusion is to be added to the exclusions under Coverage A—bodily injury and property damage liability—in Section I, Coverages.  (1st Policy at 116; 2d Policy at 55; 3d Policy at 57.)

as the individually owned portions of the Project.  (*See id.* ¶¶ B, 1.9.42, 5.1.)

Correspondingly, the CCRs provide for common ownership by the unit-owners of the

land on which the Project sits as well as the parts of the Project not included in the units.

(*See id.* ¶¶ B, 1.9.11, 1.9.35, 1.9.42, 2.1, 5.1, 6.1; *see also id.* ¶¶ 7.1 (describing the

"Limited Common Elements"), 9.)

        Litigation related to the Project commenced in 2007, when the Admiral Way

Condominium Owners Association ("ACOA") sued Admiral in King County Superior

Court alleging defects in the construction of the Project and Admiral added Ledcor as a

third party defendant ("the ACOA Suit").  (*See* Mot. at 6-7; Resp. at 4-5; 1st Sparling

Decl. ¶ 6, Ex. E ("ACOA Compl.")   While the ACOA Suit was ongoing, Admiral and

Ledcor sued SQI and various other subcontractors, also in state court ("the Contractor

Suit").  (*See* Mot. at 7-8; Ledcor Compl.)  Cornhusker defended SQI in the Contractor

Suit under a reservation of rights.  (Resp. at 8; 1st Sparling Decl. ¶ 9, Ex. H.)  From there,

however, litigation continued to proliferate as Zurich American Insurance Company

("ZAIC"), one of Ledcor's insurers, brought a declaratory judgment action in state court

asserting that no coverage existed under its policies ("the Coverage Suit").  (*See* Mot. at

8-9; Resp. at 5-6.)

        Several other insurers also became involved in the Coverage Suit, including

Cornhusker and First Mercury Insurance Company ("FMIC"), another of SQI's insurers.

(*See* Resp. at 5-6; Mot. at 8.)  In the Coverage Suit, Admiral and Ledcor asserted that

they are additional insureds under SQI's policies and that Cornhusker and FMIC

therefore had a duty to defend and indemnify them in the ACOA suit.  (*See* Mot. at 8;

Resp. at 5; 1st Sparling Decl. ¶¶ 12-13, Exs. K-L.)  FMIC later filed a declaratory action

in this court seeking a determination that it owed no duty to defend or indemnify SQI

("the FMIC Suit").  (*See First Mercury Ins. Co. v. SQI*, No. C13-2110JLR (W.D.

Wash.).)  This court stayed the FMIC Suit under the *Brillhart* abstention doctrine.  (*See

id.* Dkt. # 62.)

       Over the last year, the parties to these various suits have begun to resolve their

claims.  ACOA, for example, settled its claims against Admiral.  (Resp. at 5.)  In the

Coverage Suit, Cornhusker obtained a summary judgment ruling that at least Ledcor is

not an additional insured under SQI's policies.[6]  (*See* 1st Sparling Decl. ¶¶ 12-13, Exs. K-

L.)  Most importantly for this case, SQI settled with Ledcor and Admiral in the

Contractor Suit.  (*See* Resp. at 8; 1st Sparling Decl. ¶ 10, Ex. I ("Stip. Judgment").)

Pursuant to that settlement, SQI agreed to a stipulated judgment and assigned its rights

---

[6] Cornhusker contends that its victory on that motion was broader and included a ruling
that Admiral was also not covered under SQI's policies.  (*See* Mot. at 9, 15; Reply at 6.)
Defendants respond that the ruling pertained only to Ledcor's status as an additional insured.
(*See* Resp. at 5, 20-21.)  Although Cornhusker's motion sought a finding of no coverage as to
"any party" to the Coverage Suit (2d Sparling Decl. ¶ 2, Ex. A), the resulting orders mention
only Ledcor (*see* 1st Sparling Decl. ¶¶ 12-13, Exs. K-L).  Specifically, the first order grants
summary judgment on Ledcor's breach of contract claims on two bases (1) additional insured
status, and (2) the residential construction exclusion.  (1st Sparling Decl. ¶ 12, Ex. K.)  The
second order grants summary judgment on and dismisses Ledcor's third-party claims against
Cornhusker on the ground that Ledcor is not an additional insured under the policies at issue.
(1st Sparling Decl. ¶ 13, Ex. L.)  The parties have provided scant information and no authority
regarding the breadth and preclusive effect of these state court orders, and more importantly, it is
unclear whether the issue is even within the scope of Cornhusker's present motion.  (*See* Mot. at
2; Reply at 8 ("[S]ummary judgment should be granted ruling that Cornhusker's condominium
exclusions bar coverage for SQI's stipulated judgment.")  As such, the court expresses no
opinion at this time regarding the breadth and preclusive effect of the state court orders.

1  against Cornhusker to Ledcor and Admiral in exchange for a covenant not to execute.

2  (*See* Resp. at 8; Stip. Judgment; 1st Sparling Decl. ¶ 11, Ex. J ("IFCA Notice").)

3         The settlement between SQI and Ledcor and Admiral signaled the beginning of

4  this action.  Not only did SQI assign its rights against Cornhusker and obtain a covenant

5  not to execute, but Admiral, Ledcor, and SQI have given notice to Cornhusker of their

6  intent to file claims against it under the Insurance Fair Conduct Act ("IFCA"), RCW

7  48.30.15.  (*See* Stip. Judgment; IFCA Notice.)  Anticipating impending litigation against

8  Admiral and Ledcor as SQI's assignees,[7] Cornhusker filed this action in federal court

9  seeking a declaration that its policies do not provide coverage for the losses involved in

10 the Contractor Suit.  (*See* Compl. (Dkt. # 1); Mot.)

11        Shortly after Cornhusker filed this action, the case was transferred to this court as

12 related to the FMIC Suit (*see* 10/3/14 Min. Order (Dkt. # 24)), and the court issued an

13 order to show cause regarding diversity jurisdiction (*see* OSC (Dkt. # 25)).  The court

14 noted that one of the parties in this case, Admiral, is a limited liability company ("LLC"),

15 that the court must analyze the citizenship of each member of an LLC for purposes of

16 assessing diversity of citizenship, and that Cornhusker had not provided information on

17 the citizenship of Admiral's members.  (*See* OSC at 2.)  The court therefore ordered

18

19

---

20      [7] True to their word, Defendants have counterclaimed for breach of contract, bad faith,

21 violations of the Washington Consumer Protection Act ("CPA"), RCW 19.86 *et seq*., and
   violations of IFCA.  (*See* SQI Ans. (Dkt. # 16) ¶ 4 (breach of contract, IFCA, bad faith; CPA);

22 Admiral Ans. (Dkt. # 17) ¶ 4 (breach of contract, CPA); Ledcor Ans. (Dkt. # 18) ¶ 4 (breach of
   contract, bad faith, CPA).)

1    Cornhusker to provide that information within seven days.  (*See id.*)  Six days later,

2    Cornhusker complied.  (*See* Resp. to OSC (Dkt. # 27).)

3         On November 13, 2014, Cornhusker filed the instant motion for summary

4    judgment.  (*See* Mot.)  Cornhusker's motion attempts to establish that Cornhusker has no

5    duty to indemnify SQI or its assignees for the losses at issue in the Contractor Suit.  (*See*

6    *id.* at 1-2, 16.)  The basis for this position is the exclusion in the policies that Cornhusker

7    issued to SQI which bars coverage for personal injury and property damage resulting

8    from or arising out of residential construction, including the construction of

9    condominiums.  (*See id.* at 11-16.)  Cornhusker argues that the losses at issue in the

10   Contractor Suit fall within residential construction exclusion because those losses arose

11   out SQI's work on the construction of condominiums.  (*See id.*)

12        Defendants counter that the court should strike the motion for summary judgment

13   or deny it and grant summary judgment in SQI's favor on the issue of coverage.  (*See*

14   Resp. at 1-2.)  In support of the first contention, Defendants argue that (1) the court has

15   not yet ruled on the order to show cause and therefore a motion for summary judgment is

16   premature; (2) the court should stay this matter because it previously stayed the FMIC

17   Suit; and (3) the court should grant Defendants additional time to conduct discovery

18   before entertaining a motion for summary judgment.  (*See id.* at 7-9.)  Turning to the

19   merits of the motion, Defendants assert that coverage exists because the residential

20   construction exclusion does not apply to the policies' PCOH provisions, and even if the

21   exclusion does apply to those provisions, coverage nevertheless exists under several

22   exceptions to the residential construction exclusion.  (*See id.* at 9-20.)

Over fourteen weeks after Cornhusker filed its reply, Defendants filed a motion for leave to file a surreply. (*Compare* Reply *with* Mot. for Surreply.) This motion purports to address "new arguments presented by [Cornhusker] in its reply brief." (Mot. for Surreply at 1-2.) Cornhusker's motion for summary judgment and Defendants' motion to strike and motion for leave to file a surreply are now before the court.

## DISCUSSION

**A.    Defendants' Motion for Leave to File a Surreply**

Defendants filed their motion for leave to file a surreply on March 18, 2015, over fourteen weeks after Cornhusker filed its reply and just over a week before oral argument. (*See id.*; *see generally* Dkt.) Defendants assert that a surreply is warranted because Cornhusker has raised in its reply memorandum "new arguments which are at best misleading." (Mot. for Surreply at 2.) While recognizing that their request is untimely, Defendants nevertheless urge the court to excuse their delay pursuant to Federal Rule of Civil Procedure 1 and the court's inherent authority to control its own docket and calendar. (*Id.* (citing Fed. R. Civ. P. 1; *Young v. I.N.S.*, 208 F.3d 1116 (9th Cir. 2000)).) The court is unwilling to excuse Defendants' delay.

Local Civil Rule 7(g) governs the circumstances under which a party in this district may file a surreply to address allegedly improper material in a reply brief. *See* Local Rules W.D. Wash. LCR 7(g). Among other requirements, Rule 7(g) provides, "The surreply must be filed within five days of the filing of the reply brief . . . ." *Id.* Defendants waited over 100 days to file their request. (*See* Mot. for Surreply at 1.) In light of this substantial violation of the Local Rules and Defendants' failure to offer any

1    explanation for their delay, the court finds that this is not an appropriate situation in

2    which to excuse untimely filing through the exercise of the court's inherent authority to

3    control its docket and calendar.  As such, the court denies Defendants' motion for leave

4    to file a surreply.

5    **B.    Defendants' Motion to Strike**

6           Defendants offer three arguments for why the court should strike Cornhusker's

7    motion.  The court rejects all of them.  First, Defendants argue that diversity jurisdiction

8    has yet to be established because the court has not issued a ruling on the order to show

9    cause.  (*See* Resp. at 7-8.)  The court, however, is under no obligation to discharge or rule

10   on orders to show cause.  Moreover, Cornhusker complied with the order to show cause

11   (*see* Resp. to OSC), and Defendants have not challenged Cornhusker's submission (*see*

12   Dkt.; Resp. at 7-8[8]).  The order to show cause required Cornhusker to provide

13   information on Admiral's membership within seven days.  (OSC at 2.)  Cornhusker

14   provided the requested information six days later (*see* Resp. to OSC at 1-2, 5-6 (showing

15   that all Admiral's members are Washington residents)), and nearly five months have now

16   passed without the court taking action to remand the case (*see* Dkt.).  As the court's

17   silence should have indicated, the court has accepted Cornhusker's response as

18   satisfactory and found that diversity jurisdiction exists over this matter.

19

20   _____

21        [8] Although Defendants assert that "there exists a genuine issue of material fact as to the
     justiciability of the case" (Resp. at 7), Defendants fail to explain how such a genuine issue exists
22   in light of Cornhusker's response to the order to show cause and Defendants' failure to contest
     the information in that response (*see id.* at 7-8; *see also* Dkt.).

Second, Defendants contend that a stay is appropriate because the court previously stayed the FMIC Suit and has received this case on reassignment from Chief District Judge Marsha J. Pechman as related to the FMIC Suit.  (*See* Resp. at 8.)  In particular, Defendants maintain that "since this case was to be heard along with the related [FMIC Suit], and that lawsuit was stayed pending the [Coverage Suit], this case, too, should be stayed in federal court under the same terms and conditions." (*Id.*)  As an initial matter, nothing in this court's or Chief Judge Pechman's rulings suggests that this suit is "to be heard along with" the FMIC Suit.  Instead, Chief Judge Pechman's order transferring this case merely states that this case and the FMIC Suit are "related" and may present "common questions of fact or law."  (10/3/14 Min. Order at 1.)  The order does not indicate that the cases will be heard together or that an order in one case will necessarily apply to the other.

Furthermore, to the extent Defendants request that the court stay this case under *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942) and its progeny, and not only because this case is "related" to the FMIC Suit, Defendants' request is not properly before the court.  Federal Rule of Civil Procedure 7(b) provides that "[a] request for a court order must be made by motion . . . in writing, state with particularity the grounds for seeking the order, and state the relief sought."  Fed. R. Civ. P. 7(b); *see also* Local Rules W.D. Wash. LCR 7.  Defendants, however, make their request only in their response to Cornhusker's motion and fail to "state with particularity" the reasons why *Brillhart* abstention is appropriate here.  (*See* Resp. at 8.)  Moreover, unless a party has "properly raised the issue" of *Brillhart* abstention, "the district court may proceed with

1    consideration of the action without sua sponte addressing whether jurisdiction should be

2    declined."  *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1227 (9th Cir. 1998).

3    Accordingly, the court rejects Defendants' request for a stay without considering the

4    issue of *Brillhart* abstention.

5         Third, Defendants assert that Cornhusker's motion is premature because no

6    meaningful discovery has taken place with respect to the issues raised in the motion.  (*See*

7    Resp. at 8-9.)  The court construes this portion of Defendants' response as motion for a

8    continuance under Federal Rule of Civil Procedure 56(d).  A party requesting a

9    continuance pursuant to Rule 56(d) "must identify by affidavit the specific facts that

10   further discovery would reveal, and explain why those facts would preclude summary

11   judgment."  *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir.

12   2006).  Defendants provide no affidavit in support of their request, list no specific facts

13   that further discovery would reveal, and do not explain how additional discovery would

14   help them resist Cornhusker's motion for summary judgment.  (*See* Resp. at 8-9.)

15   Instead, they simply identify discovery that has not yet occurred and conclude that they

16   are unable to craft an informed response without that discovery.[9]  (*See id.*)  As such, the

17   court denies Defendants' motion for a continuance under Federal Rule of Civil Procedure

18

19

---

20        [9] The court finds no merit in Defendants' complaint that Cornhusker did not provide full,
     unmarked copies of the relevant policies when it filed its motion for summary judgment.  (*See*
21   Resp. at 8-9.)  The court will not grant a continuance on that basis because Defendants admit that
     they are in possession of the policies.  (*See id.* at 8 ("[T]he relevant Cornhusker policies are in
22   the possession of the parties . . . .").)

56(d), *see Tatum*, 441 F.3d at 1100, denies Defendants' motion to strike, and turns to the merits of Cornhusker's motion.

**C.    Legal Standards**

    1.   <u>Summary Judgment</u>

    Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

    The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50.   Furthermore, the court may consider as evidence only materials that are capable of being presented in an admissible form.  *See* Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

    The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  For issues on which the moving party has the burden of proof, the moving party

must establish a prima facie case on its motion for summary judgment.  *UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of the U.S. & Can. AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  *Id.* at 1473.  If the moving party does so, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 1471 (internal citations and quotation marks omitted).  "Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid summary judgment."  *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

### 2.  Insurance Policies

The interpretation of an insurance policy is a question of law for the court.  *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002).  Insurance policies are contracts, which are construed as a whole with the terms interpreted as they would be understood by an average person purchasing insurance.  *Id.*  If the language of an insurance policy is clear and unambiguous, the court must enforce it as written and may not create ambiguity where none exists.  *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998).

The determination of whether coverage exists involves a burden-shifting framework.  *See McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003-04 (Wash. 1992).  The insured bears the initial burden to demonstrate that the loss falls

1   within the scope of the policy's insured losses.  *See id.*  If the insured makes that

2   demonstration, the insurer can avoid coverage by showing that specific policy language

3   excludes the loss.  *See id.* at 1004.  Exclusions from coverage are strictly construed

4   against the insurer because they are contrary to the protective purpose of insurance.

5   *Stuart v. Am. States Ins. Co.*, 953 P.3d 462, 464 (Wash. 1998).  If the insurer shows that

6   an exclusion applies, the burden shifts back to the insured to demonstrate that the loss fits

7   within an exception to the exclusion.  *See MKB Constructors v. Am. Zurich Ins. Co.*, No.

8   C13-0611JLR, 2014 WL 4792034, at *16 (W.D. Wash. Sept. 25, 2014); *Mid-Continent*

9   *Cas. Co. v. Titan Const. Corp.*, No. 05-CV-1240 MJP, 2009 WL 1587215, at *5 (W.D.

10  Wash. June 5, 2009).

11  **D.    Applicability of the Residential Construction Exclusion**

12          Cornhusker argues that it has no duty to indemnify SQI for the losses involved in

13  the Contractor Suit ("the Losses") because the Losses fall within the residential

14  construction exclusion ("the Exclusion") included in SQI's policies.  (*See* Mot. at 1-2, 16-

15  17.)  Defendants counter that SQI has coverage under the PCOH provisions of the

16  policies because those provisions represent a distinct separate grant of coverage to which

17  the Exclusion is inapplicable.  (*See* Resp. at 15-20.)  In addition, Defendants argue that

18  even if the Exclusion applies to the PCOH provisions, SQI nevertheless has coverage

19  under several exceptions to the Exclusion.  (*See id.* at 14-15, 19.)

20          1.    The Exclusion and the PCOH Provisions

21          Defendants argue that coverage exists under the PCOH provisions of SQI's

22  policies because those provisions are a separate grant of coverage under the policies to

ORDER- 15

1    which the Exclusion does not apply.  (*See id.* at 15-20.)  As noted above, the PCOH

2    provisions provide coverage for property damage that arises out of the insured's

3    completed work.  (*See supra* Part II; 1st Policy at 109; 2d Policy at 48; 3d Policy at 49);

4    *Goodwin*, 6 P.3d at 4.  The parties appear not to dispute, at least in this context, that the

5    Losses arose out of SQI's completed work, and for the purposes of this motion, the court

6    assumes but does not decide that that is true.  Accordingly, Defendants' argument boils

7    down to a pure question of policy interpretation—that is, whether the Exclusion applies

8    to the PCOH provisions, or alternatively, whether those provisions provide separate

9    coverage to which the Exclusion is inapplicable.

10           The court finds that the PCOH provisions do not create separate coverage and that

11   the Exclusion applies to the PCOH Provisions.  SQI's CGL policies list only three

12   coverages, which are each set forth in Section I of the policies:  Coverage A (Bodily

13   Injury and Property Damage Liability), Coverage B (Personal and Advertising Injury

14   Liability), and Coverage C (Medical Payments).  (1st Policy at 92-102; 2d Policy at 31-

15   41; 3d Policy at 32-42.)  Each of these coverages contains its own insuring agreement and

16   exclusion.  (1st Policy at 92-102; 2d Policy at 31-41; 3d Policy at 32-42.)  By contrast,

17   PCOH is listed only in the "Definitions" section of the policies and is not designated as

18   distinct type of coverage.  (1st Policy at 109; 2d Policy at 48; 3d Policy at 49.)  As a

19   result, any claim falling under the definition of PCOH is subject to the terms and

20   limitations of the coverage portion to which PCOH applies.  *See Sparta Ins. Co. v.*

21   *Colareta*, 990 F. Supp. 2d 1357, 1365 (S.D. Fla. 2014).  Because PCOH is defined as

22   applying to "bodily injury" and "property damage," it necessarily falls under Coverage A

1  of SQI's CGL policies, the same coverage to which the Exclusion applies.  *Id.*; (*see* 1st

2  Policy at 109; 2d Policy at 48; 3d Policy at 49; *see also* 1st Policy at 92; 2d Policy at 31;

3  3d Policy at 32.)

4          Furthermore, Section II, which lists the policies' limits of insurance, states as

5  follows:  "The Products-Completed Operations Aggregate Limit is the most we will pay

6  *under Coverage A* for damages because of 'bodily injury' and 'property damage'

7  *included in the [PCOH]*."  (1st Policy at 104; 2d Policy at 43; 3d Policy at 44 (emphasis

8  added).)  Because the policies set a limit on Cornhusker's liability under Coverage A

9  with respect to PCOH, the PCOH provisions fall under the terms of Coverage A and are

10  not a freestanding form of coverage.  *See Colareta*, 990 F. Supp. 2d at 1366.

11          Moreover, other exclusions under Coverage A specifically address limitations on

12  PCOH.  For example, exclusion (j) provides that "Paragraph (6) of this exclusion does

13  not apply to 'property damage' included in the '[PCOH],'" and exclusion (l) removes

14  from coverage "'property damage' to 'your work' arising out of it or any part of it and

15  included in the '[PCOH].'"  (1st Policy at 94-95; 2d Policy at 33-34; 3d Policy at 34-35.)

16  Such language is superfluous unless the PCOH is part of Coverage A to which Coverage

17  A's exclusions apply.  *See Fedway Marketplace W., LLC v. State*, 336 P.3d 615, 620 n.12

18  (Wash. Ct. App. 2014) ("[C]ourts construe contracts as a whole to effectuate all of the

19  contracts provisions, so as not to render words superfluous[.]") (citing *Colo. Structures,*

20  *Inc. v. Ins. Co. of the W.*, 167 P.3d 1125, 1131 (Wash. 2007)).  Nor is there any reason to

21  think that only some of Coverage A's exclusions apply to the PCOH provisions while

22

1   others, such as the residential construction exclusion, do not.  (*See* 1st Policy at 92-102,

2   116; 2d Policy at 31-41, 55; 3d Policy at 32-42, 57.)

3         Accordingly, the court finds that the PCOH provisions are not a separate type of

4   coverage under the policies.  Rather they are merely a definition that pertains to the

5   coverage provided under Coverage A.  Any exclusions that apply under Coverage A

6   therefore also apply to the PCOH provisions.  Furthermore, the court finds that these

7   aspects of the policies are unambiguous.  *See B&L Trucking*, 951 P.2d at 256.  Multiple

8   courts have reached the same conclusions when faced with the same arguments that

9   Defendants make here and policy language that is identical in all relevant respects.  *See*

10  *James River Ins. Co. v. Fortress Sys., LLC*, 569 Fed. App'x 896, 900-01 (11th Cir. 2014);

11  *Penn. Nat'l Mut. Cas. Ins. Co. v. Snider*, 996 F. Supp. 2d 1173, 1186-87 (M.D. Ala.

12  2014); *Colareta*, 990 F. Supp. 2d at 1364-66 and n.3 (collecting cases).  Because the

13  Exclusion applies to Coverage A, the Exclusion also applies to the PCOH provisions.

14  (*See* 1st Policy at 116; 2d Policy at 55; 3d Policy at 57.)

15        Defendants' arguments that the PCOH provisions provide separate coverage fail to

16  persuade the court.  First, Defendants contend that the PCOH provisions must provide

17  distinct coverage to which the Exclusion is inapplicable because PCOH has its own

18  coverage limits, SQI paid additional premiums for PCOH, and the definition of PCOH

19  includes its own exceptions.  (*See* Resp. at 16.)  None of these circumstances, however,

20  leads to the conclusion that PCOH provides distinct coverage.  A different limit of

21  coverage for PCOH is just that—"a different applicable *limit*, not a separate form of

22  coverage."  *Colareta*, 990 F. Supp. 2d at 1364 (emphasis in original).  Nor does an

1   increased premium provide "evidence that claims classified as [PCOH] are subject to

2   distinct terms under the CGL." *Id.* at 1364-65.  Finally, internal limitations in the PCOH

3   definition do not support the proposition that PCOH is not subject to any other limitations

4   or exclusions in the policy.

5          Defendants next argue that applying the Exclusion to the PCOH provisions would

6   render PCOH coverage "illusory and void," be inconsistent with the "intent of the

7   insurance policies," and cause PCOH coverage to "fail[] of its essential purpose."  (Resp.

8   at 17-19 (internal quotation marks omitted).)  The court disagrees.  Defendants' argument

9   might have merit if the Exclusion and the PCOH provisions overlapped completely.  Yet

10  the Exclusion applies only to "residential construction" in defined circumstances (*see* 1st

11  Policy at 116; 2d Policy at 55; 3d Policy at 57), whereas the PCOH provisions apply to

12  completed work in general (*see* 1st Policy at 109; 2d Policy at 48; 3d Policy at 49).  Thus,

13  SQI would potentially have had the benefit of the PCOH provisions on any project that

14  was not residential construction as defined in the applicable version of the Exclusion.[10]

15  Accordingly, applying the Exclusion to the PCOH provisions does not render the PCOH

16  provisions void or illusory or cause them to fail of their essential purpose, and it is not

17  inconsistent with the intent of the insurance policies.

18

19  _____

20         [10] Nor do Defendants contend that SQI only works on residential projects.  In fact, the
    record reveals that SQI likely had several non-residential projects during the period of its policies
21  with Cornhusker.  (*See, e.g.,* 1st Policy at 12 (a "midterm change document" that appears to add
    an additional insured for a "designated construction project" listed as "Rainier Orthopedic
22  Institute"), 22 (same but for the designated construction project "Egrari Center for Plastic
    Surgery").

2. <u>The Exclusion and Its Exceptions</u>

Defendants next contend that even if the Exclusion applies to the PCOH provisions, SQI nevertheless has coverage for the Losses under several exceptions to the Exclusion. (*See* Resp. 14-15, 19.)  Cornhusker, on the other hand, maintains that under each of SQI's policies the Exclusion bars all coverage for the Losses. (*See* Mot. at 11-15.)  Resolving that dispute requires the court to analyze the particular language of the Exclusion in each of SQI's policies.

The Exclusion's language varies in each of SQI's three policies.  Both the 2003-04 version and the 2004-05 version of the Exclusion bar coverage for "'property damage' resulting from or arising out of . . . work of any nature or extent on, with respect to, or in support of structures intended for human habitation," including condominiums.  (1st Policy at 116; 2d Policy at 55.)  The 2004-05 version, however, contains an exception for "apartments." (2d Policy at 55.)  For its part, the 2005-06 version of the Exclusion precludes coverage only for "'property damage' resulting from or arising out of the original construction, in whole or in part, of condominiums or townhouses." (3d Policy at 57.)  In addition, the 2005-06 Exclusion contains what is worded as an exception for "repairs." (*See id.*)

Thus, in order to merit summary judgment on the applicability of all three versions of the Exclusion, Cornhusker must demonstrate the absence of a genuine issue of material fact regarding each of the following propositions:  (1) the Project is a "structure intended for human habitation"; (2) the Project is "condominiums"; (3) the Losses arose out of SQI's "work" on the Project; and (4) the Losses arose of SQI's work on the "original

1   construction" of the Project.  *See Celotex*, 477 U.S. at 323; *Nor-Cal Plumbing*, 48 F.3d at

2   1471, 1473.  The court finds that no genuine issue of material fact exists with respect to

3   all but the last proposition.

4         The court agrees with Cornhusker that the Project is both "a structure intended for

5   human habitation" and "condominiums."  (*See* Mot. at 12-13.)  There is no serious

6   dispute regarding the former term.  The Project CCRs that Admiral filed provide that 65

7   of the Project's 68 units are to be residential (Project CCRs ¶ 3.1); therefore, the Project

8   is clearly a structure intended for human habitation.  Defendants do not dispute that point.

9         Defendants do challenge, however, whether the structure qualifies as

10  condominiums.  In particular, Defendants argue that the 2004-05 exception for

11  "apartments" applies because up to 25% of the units in the Project can be rented out.

12  (*See* Resp. at 19; Gartin Decl. ¶ 9.)  The court disagrees.  The policy defines "apartments"

13  as a structure with multiple single-family dwellings "where the owner of the structure

14  owns each dwelling together with the underlying property."  (2d Policy at 55.)  The

15  policy also establishes that "condominiums" are "structures whereby separate parts of the

16  structure may be owned individually by separate owners and the underlying property is

17  owned in common by all of the separate owners."  (*Id.*)

18        Read in light of those definitions, the Project CCRs reveal that the Project consists

19  of condominiums, not apartments.  In particular, the CCRs provide that each unit is

20  owned individually while the unit-owners own the remainder of the Project in common.

21  (*See* Project CCRs ¶¶ B, 1.9.11, 1.9.35, 1.9.42, 2.1, 5.1, 6.1; *see also id.* ¶¶ 7.1, 9.)  No

22  single owner owns "each dwelling together with the underlying property," as required for

the apartments exception. (*See* 2d Policy at 55.) Nor are condominiums converted to apartments simply because some unit owners have the right to rent out their units. Rental does not affect the ownership rights in the structure and underlying property, which are the key considerations under the policy. (*See id.*) Thus, the Project constitutes condominiums for purposes of SQI's policies.[11]

In addition, it is undisputed that the Losses arose out of SQI's work on the Project. Ledcor's complaint against SQI in the Contractor Suit alleges defects in SQI's work on the Project. (*See* Ledcor Compl. ¶¶ 12-13, 22, 24.) Moreover, Defendants' entire position in this litigation is premised on the notion that SQI's work caused the Losses. (*See, e.g.*, Resp. at 3-4, 15-20.) Cornhusker has therefore carried its burden on summary judgment with respect to three of the four propositions that the court noted above.

The court finds, however, that with respect to the 2005-06 policy a genuine dispute of material fact remains regarding whether all the Losses arose out of or resulted from "original construction." In framing the inquiry in this way, the court departs from the parties' presentation, which focuses on the applicability of the so-called "repairs exception" to the 2005-06 Exclusion. (*See* Resp. at 14-15; Reply at 4-5.) That provision states that the 2005-06 Exclusion "does not apply to the remodeling or repair of any

---

[11] This conclusion finds confirmation in the manner in which Admiral, Ledcor, and other parties to the underlying litigation have discussed the Project. (*See, e.g.*, 1st Sparling Decl. ¶ 7, Ex. F ("Admiral Ans. & Counterclaims in ACOA Suit") ¶ 3.5 ("On or about April 3, 2001, Admiral entered into a written contract with Ledcor . . . whereby Ledcor agreed to provide all materials and labor to construct a sixty-five unit condominium building with attached commercial and garage spaces . . . ."); Ledcor Compl. ¶ 12 ("Ledcor was the general contractor for [the] Admiral Way Condominium Project . . . .").

1    existing structure." (3d Policy at 57.) Focusing on this language, the parties argue over

2    whether Defendants can show that some of the Losses arose out of repairs (*see* Resp. at

3    14-15; Reply at 4-5), but they fail to discuss whether Cornhusker has shown that the

4    Exclusion applies in the first place. In so doing, the parties appear to assume that

5    showing the type of work giving rise to the loss is wholly part of the insured's burden to

6    prove an exception rather than part of the insurer's antecedent burden to prove an

7    exclusion. *See MKB Constructors*, 2014 WL 4792034, at *16.

8            The problem with the parties' interpretation is that it fails to account for the 2005-

9    06 Exclusion's language regarding "original construction."[12] (3d Policy at 57.)

10   Appearing in the main body of the Exclusion, not within the so-called exception, that

11   language suggests that Cornhusker has the burden to prove that the Losses arose out of or

12   resulted from the original construction of the Project.[13] (*See id.*) The court interprets

13   "original construction" in accordance with its plain meaning—as the process of building

14   to completion a new structure, and as distinct from work performed after completion,

---

16   [12] The 2005-06 Exclusion reads, in pertinent part, as follows: "This insurance does not
17   apply to 'bodily injury' or 'property damage' resulting from or arising out of the original
     construction, in whole or in part, of condominiums . . . . This exclusion does not apply to the
     remodeling or repair of any existing structure . . . ."

18

19   [13] Of course, Defendants, as the parties in the role of the insured, bear the initial burden
     of demonstrating coverage. *See McDonald*, 837 P.2d at 1003-04. Yet where, as here, the insurer
20   moves for summary judgment only on the applicability of an exclusion and gives no indication
     that it challenges the insured's ability to carry its initial burden of showing coverage (*see
21   generally* Mot.), the insurer will not be heard to complain that the insured has failed to offer
     affirmative evidence of coverage but has instead focused its opposition on the exclusion.
     Accordingly, the court rejects Cornhusker's complaint that Defendants have not provided
22   evidence that otherwise covered property damage occurred during the 2005-06 policy period.
     (*See* Reply at 4-5.)

1   such as repairs or remodeling.  Admittedly, the presence of the "repairs exception"

2   confuses matters somewhat, possibly introducing ambiguity concerning whether the type

3   of work giving rise to the Losses is part of the Exclusion (and therefore part of the

4   insurer's burden) or part of an exception to the Exclusion (and therefore part of the

5   insured's burden).  Nevertheless, even if such ambiguity exists, the court must resolve it

6   in favor of the insured.  *See Stuart*, 953 P.3d at 464; *B&L Trucking*, 951 P.2d at 256.

7   Thus, the court concludes that in order to prove that the 2005-06 Exclusion applies,

8   Cornhusker has the burden to demonstrate that the Losses arose out of or resulted from

9   original construction.

10        Cornhusker has failed to make the necessary demonstration.  In fact, due to its

11  mistaken view regarding its burden of proof, Cornhusker has ignored the issue of whether

12  the Losses arose out of original construction.  (*See generally* Mot.; Reply.)   While

13  Defendants' admissions establish that at least some of the Losses arose out of SQI's

14  original construction (*see* Ledcor Compl. ¶¶ 12-13; Resp. at 3-4, 15), Defendants have

15  also offered unchallenged evidence that calls into question whether all the Losses arose

16  from that source.  Specifically, Defendants provide a bid, contract, and invoice showing

17  that SQI performed repairs on the Project in May and June of 2005, two years before the

18  ACOA Suit.  (Gardner Decl. ¶¶ 2-4, Exs. 1-3; *see also* Resp. at 3-4, 14-15.)  Viewing the

19  evidence in the light most favorable to Defendants and mindful that Cornhusker bears the

20  burden of proof on this issue, the court finds that a genuine dispute of material fact

21  remains regarding whether some of the Losses arose out of work that was not "original

22

ORDER- 24

1  construction."[14]  (*See* 3d Policy at 57); *Nor-Cal Plumbing*, 48 F.3d at 1471, 73;

2  *McDonald*, 837 P.2d at 1004.

3      To sum up, Cornhusker has shown there is no genuine dispute of material fact that

4  the Project is a Structure intended for human habitation and consists of condominiums,

5  and that the Losses arose out of SQI's work on the Project.  A genuine dispute of material

6  fact remains, however, regarding whether the Losses all arose out of or resulted from

7  original construction.

8      These findings have the following implications for coverage of the Losses under

9  SQI's policies with Cornhusker:  No coverage exists under the 2003-04 and 2004-05

10  policies because those versions of the Exclusion are fully applicable here.  Any property

11  damage occurring during those policy periods indisputably arose out of SQI's work on a

12  structure intended for human habitation and on condominiums.  Nevertheless, coverage

13  may exist under the 2005-06 policy to the extent that otherwise covered property damage

14  arising out of SQI's 2005 repairs occurred during that policy period.  Of course, if

15

_____

16      [14] Similarly, Defendants are not entitled to a summary judgment ruling that coverage
exists under the 2005-06 policy.  Although Cornhusker bears the burden to prove the Exclusion

17  applies, Defendants cannot obtain summary judgment on the issue of coverage without first
showing that covered property damage occurred within the policy period.  *See McDonald*, 837

18  P.2d at 1003-04.  Defendants, however, have offered only an unsupported assertion that property
damage occurred between May 2005 and May 2006.  (*See* Resp. at 4, 15.)  Defendants' assertion

19  is not evidence on the basis of which the court could grant summary judgment.  *See Orr*, 285
F.3d at 773; *Estrella*, 682 F.2d at 819-20.  Moreover, when evaluating Defendants' request for

20  summary judgment, the court must view the evidence that does exist in the record in the light
most favorable to Cornhusker.  *See Scott*, 550 U.S. at 378.  Accordingly, the court finds that a

21  genuine issue of material fact remains regarding whether coverage exists under the 2005-06
policy and therefore denies Defendants' request for summary judgment.  (*See* Resp. at 2, 9, 14-

22  15.)

1  property damage that occurred during that period arose out of SQI's original

2  construction, such property damage would be subject to the 2005-06 Exclusion and

3  would not be covered.[15]

4                                         **CONCLUSION**

5          For the foregoing reasons, the court DENIES Defendants' motion for leave to file

6  a surreply (Dkt. # 39); DENIES Defendants' motion to strike (Dkt. # 31); and GRANTS

7  in part and DENIES in part Cornhusker's motion for summary judgment (Dkt. # 29).

8          Dated this 30th day of March, 2015.

9

10

11                                                  _____

12                                                  JAMES L. ROBART
                                                    United States District Judge

13  _____

14  [15] Defendants also request that the court deny Cornhusker's motion under Federal Rule of
    Civil Procedure 56(c)(2) for relying on incomplete, marked-up copies of the policies as evidence.
15  (*See* Resp. at 12-13.)  The court rejects that request.  Rule 56(c)(2) allows a party to "object that
    the material cited to support or dispute a fact [on summary judgment] cannot be presented in a
16  form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); *see also Orr*, 285 F.3d at
    773.
17          To the extent Cornhusker's initial policy excerpts would have been inadmissible, such
    inadmissibility is irrelevant for two reasons.  First, Cornhusker has submitted what it asserts are
18  complete, unaltered copies of the policies ("clean copies") as declarations in support of its reply
    memorandum.  (*See* 2d Sparling Decl. ¶¶ 3-5, Exs. B-D; *see also* Reply at 7 n.5.)  Defendants,
19  who have their own copies of the policies (*see* Resp. at 8), have not objected to or pointed out
    any flaws in the clean copies, and the court finds that it may consider the clean copies as
    summary judgment evidence.
20          Second, the court has not relied on the initial excerpts.  Having been made aware of
    potential problems with the initial excerpts, the court has based its analysis on the clean copies.
21  Further, Defendants will not be heard to object that they could not rely on the clean copies in
    formulating their response.  Defendants have admitted that they have their own copies of the
    policies (*see id.*), and they submitted excerpts of those copies with their opposition to
22  Cornhusker's motion (*see* Martens Decl. ¶¶ 2-4, Exs. A-C).

ORDER- 26