UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BERKSHIRE HATHAWAY
HOMESTATE INSURANCE CO.,

Plaintiff,

v.

SQI, INC., et al.,

Defendants.

CASE NO. C14-0868JLR

ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court are (1) Plaintiff Berkshire Hathaway Homestate Insurance

Company, formerly known as Cornhusker Casualty Company's ("Cornhusker"), motion

for summary judgment (Corn. Mot. (Dkt. # 73)) and (2) Defendants and

Counterclaimants SQI, Inc. ("SQI"), Ledcor Industries (USA), Inc. ("Ledcor") and

Admiral Way, LLC's ("Admiral") motion for summary judgment (Def. Mot. (Dkt. # 70)).

The court has considered the motions and the parties' submissions related to the motions,

1   the balance of the record, and the relevant law.  Being fully advised, the court DENIES

2   Defendants' motion, GRANTS Cornhusker's motion, DECLARES that the insurance

3   policies at issue provide no coverage to Defendants related to the underlying litigation,

4   and DISMISSES Defendants' counterclaims.

5                        **II.    BACKGROUND**

6           This is an insurance dispute arising out of underlying construction defect

7   litigation.  Cornhusker moves for summary judgment that it has no obligation to

8   indemnify its insured, SQI, with respect to the underlying litigation.  (*See* Corn. Mot. at

9   17-19.)  Cornhusker's motion also seeks dismissal of SQI's extra-contractual

10  counterclaims (*see id.* at 19-21), Defendants' counterclaim for reformation (*see id.* at 27-

11  28), and Admiral's and Ledcor's counterclaims as putative additional insureds (*see id.* at

12  21-27).  Defendants oppose Cornhusker's motion and, in their own motion, request that

13  the court grant summary judgment in their favor on SQI's extra-contractual

14  counterclaims.  (*See* Def. Mot. at 2.)

15          The case has its origins in a construction project in West Seattle.  In 2001,

16  developer Admiral hired Ledcor as the general contractor to build the Admiral Way

17  Project ("the Project"), a structure consisting of 65 residential units, two ground-floor

18  commercial units, and an underground parking garage.  (*See* Corn. Mot. at 6; 3/30/15

19  Order (Dkt. # 48) at 2; 1st Sparling Decl. (Dkt. # 30) ¶ 5, Ex. D ("Project CCRs") ¶ 3.1;

20  *see also* 1st Martens Decl. (Dkt. # 33) ¶ 5, Ex. D ("Gartin Decl.") ¶¶ 2, 4.)  Ledcor in turn

21  hired multiple subcontractors.  (*See* 1st Sparling Decl. ¶ 8, Ex. G ("Ledcor Compl.")

22  ¶ 12; *see also* Gartin Decl. ¶ 4.)  One of those subcontractors was SQI, which Ledcor

hired to do the roofing on the Project. (Corn. Mot. at 6; Ledcor Compl. ¶¶ 12-13.) In addition to working on the original roofing, SQI also performed repairs on the roof in May and June of 2005. (*See* Corn. Mot. at 8; 1st Gardner Decl. (Dkt. # 32) ¶¶ 2-4, Exs. 1-3; 3d Gardner Decl. (Dkt. # 83) ¶¶ 2-4.)

SQI had three year-long commercial general liability ("CGL") insurance policies with Cornhusker stretching from May 2003 to May 2006. (*See* Corn. Mot. at 3; 1st Martens Decl. ¶¶ 2-4, Exs. A-C; 2d Sparling Decl. (Dkt. # 74) ¶¶ 2-4, Exs. A-C.) Only the third policy ("the Policy"), which applied from May 2005 to May 2006, is directly in issue.[1] (*See* 2d Sparling Decl. ¶ 4, Ex. C ("Policy").) The Policy provided "Bodily Injury and Property Damage Liability" coverage ("BI/PD Coverage"),[2] as well as several other categories of coverage not relevant here. (Policy at 4-14.)[3] In addition, SQI paid extra premiums for products-completed operations hazard ("PCOH"), which extended SQI's BI/PD Coverage to bodily injury and property damage arising out of SQI's

---

[1] The court has already determined that no coverage exists under SQI's first two policies (*see* 3/30/15 Order at 25), and the parties have not pointed to any relevant differences between the first two policies and the third policy with respect to Defendants' counterclaims.

[2] Under the Policy's BI/PD Coverage, Cornhusker agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Policy at 4.) Cornhusker agreed to pay for bodily injury and property damage, however, only if "(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place within the 'coverage territory,' and (2) The 'bodily injury' or 'property damage' occurs during the policy period." (*Id.*) Moreover, such coverage is subject to the exclusions included under part 2 of the BI/PD Coverage. (*Id.* at 4-9.)

[3] When referencing specific pages of the Policy, the court will use the exhibit page number found in the lower right corner of the page rather than the blue CM/ECF page number or the page number for the original document.

completed work or product as opposed to its ongoing operations.[4]  *See Goodwin v. Wright*, 6 P.3d 1, 4 (Wash. Ct. App. 2000); (3/30/15 Order at 3-4 & n.3, 15-19; 1st Martens Decl. ¶¶ 2-4, Exs. A-C.)

Multiple exclusions and limitations constrict the Policy's BI/PD Coverage.  In particular, the Policy contains endorsements that add exclusions for residential construction[5] (Policy at 24), and "injury or damage in progress"[6] (*id.* at 25).  Likewise, The Policy excludes property damage to "your work."[7]  (*Id.* at 7.)  The Policy also limits covered property damage to that which occurs during the policy period.  (*Id.* at 4.)  None of these exclusions and limitations mentions any exception for PCOH.

---

[4] SQI's policies define PCOH as "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work,'" with a series of limitations.  (Policy at 21.)

[5] The residential construction exclusion reads, in pertinent part, as follows:  "This insurance does not apply to 'bodily injury' or 'property damage' resulting from or arising out of the original construction, in whole or in part, of condominiums . . . .  This exclusion does not apply to the remodeling or repair of any existing structure . . . ."  (Policy at 24.)  The residential construction exclusion is to be added to the exclusions under BI/PD Coverage.  (*Id.*)  Unlike the 2005-06 version of the residential construction exclusion, the previous two versions contain no language limiting the exclusion to "original construction" as opposed to "the remodeling or repair of any existing structure."  (*See* 3/30/15 Order at 4 n.5, 20.)

[6] This exclusion provides, "This insurance does not apply to . . . 'Bodily injury' or 'property damage' that begins, takes place, or occurs prior to the inception date of this policy of insurance . . . .  All 'property damage' to units of or within a single project or development, . . . resulting from or arising out of substantially the same harm or conditions shall be deemed to have occurred at the earliest time of such 'property damage' to any unit of or within the project or development, . . . ."  (Policy at 25.)  As with the residential construction exclusion, the "injury or damage in progress" exclusion is to be added to the exclusions under BI/PD Coverage.  (*Id.*)

[7] Specifically, The Policy excludes "'Property damage' to 'your work' arising out of it or any part of it and included in the [PCOH].'"  (Policy at 7.)  The Policy defines "your work" as "Work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations."  (*Id.* at 22.)

1     Litigation related to the Project commenced in 2007, when the Admiral Way

2   Condominium Owners Association ("ACOA") sued Admiral in King County Superior

3   Court alleging defects in the construction of the Project and Admiral added Ledcor as a

4   third-party defendant ("the ACOA Suit").  (*See* Corn. Mot. at 13; 1st Sparling Decl. ¶ 6,

5   Ex. E ("ACOA Compl."); Admiral Ans. (Dkt. # 17) ¶¶ 3.5-3.6.)  While the ACOA Suit

6   was ongoing, Admiral and Ledcor sued SQI and various other subcontractors, also in

7   state court ("the Contractor Suit").  (*See* Corn. Mot. at 13; Ledcor Compl.)  In 2010,

8   separate coverage-related litigation began between several insurance companies and

9   Admiral and Ledcor ("the Coverage Suit").  (*See* Corn. Mot. at 14.)

10     The parties provide scant information regarding the property damage at issue in

11   these lawsuits.  One of the few documents in the record relating to problems with the

12   Project is a "list of known construction defects" that ACOA created in 2007 for its suit

13   against Admiral.  (*See* 2d Martens Decl. (Dkt. # 72) ¶ 2, Ex. 4 ("Ledcor Tender") at 7-12

14   ("ACOA Defect List") (also discussed in 2d Sparling Decl. ¶ 13, Ex. L ("Colvard

15   Report") at 7-8).)  This document lists the following alleged defects in the construction of

16   the roof at the Project:  (1) the roof membrane has several areas that lack adhesion and

17   have blisters; (2) lead flashings used to weatherproof vent stacks are poorly detailed and

18   prone to water intrusions; (3) galvanized metal flashings are poorly detailed and are

19   prone to water intrusion; (4) metal caps lack saddle flashings at transitions with above-

20   roof vertical walls; (5) two large areas on the roof have evidence of water trapped

21   between the roofing plies; and (6) several smaller areas have evidence of lack of adhesion

22   between the roofing plies.  (ACOA Defect List at 2-3.)  The list does not explain,

1  however, what property damage, if any, arose out of those construction defects.  In fact,

2  the court has been unable to locate any admissible evidence on that subject.[8]

3         Cornhusker learned of the claims against its insured when it received a tender

4  from Ledcor on October 29, 2007, asserting Ledcor's status as an additional insured and

5  requesting coverage in the ACOA Suit.  (*See* Def. Mot. at 3; 2d Martens Decl. ¶ 2, Ex. 3

6  ("Claim Notes") at 1; Ledcor Tender at 1, 6.)  Cornhusker began investigating this claim

7  within 24 hours by sending John Colvard of Washington Oregon Claim Service to

8  examine the roof and prepare a report.  (*See* Claim Notes at 1; *see also* Colvard Report

9  (dated 11/19/07).)  Cornhusker's claim notes show that Cornhusker knew on October 30,

10  2007, that SQI had performed both the original construction of the Project's roof and the

11  2005 repair work on the roof.  (*See* Claim Notes at 1.)  On December 10, 2007,

12  Cornhusker sent SQI a reservation-of-rights letter.  (*See* 2d Martens Decl. ¶ 2, Ex. 2

13  ("RoR").)  Cornhusker's letter informed SQI that Cornhusker would defend SQI in the

14  underlying dispute but that coverage might not exist under the policies due to, among

15  other policy provisions, the "your work" and residential construction exclusions.  (*See id.*

16  at 1, 9-12.)  Cornhusker's letter quoted the entire 2005-06 residential construction

17  exclusion, including its full title; however, the letter did not specifically discuss the

18

19  ───────────────

20  [8] Cornhusker has offered the deposition testimony of several experts who participated in
the underlying litigation, but Cornhusker apparently has not produced expert reports for those
individuals in this litigation.  (*See, e.g.*, Corn. Mot. at 6-7, 10-13.)  Defendants argue that this
evidence is therefore inadmissible.  (*See* Def. Resp. (Dkt. # 82) at 8 n.1 (citing Fed. R. Civ. P.
21  37(c)(1)).)  Cornhusker responds that the testimony in question is factual, not opinion, testimony
and is therefore admissible.  (*See* Corn. Reply (Dkt. # 88) at 3 n.4.)  The court disagrees and does
22  not consider the former expert testimony in deciding this motion.

ORDER- 6

1   language in the exclusion related to coverage for repairs, but rather stated only that the

2   "Residential Construction Exclusions specifically exclude coverage for residential

3   condominiums." (*Id.* at 11-12.)

4        Multiple mediations took place regarding the Contractor Suit.  First, in April 2008,

5   before Ledcor filed suit against SQI, Cornhusker received an invitation from Ledcor to a

6   mediation in May.  (*See* 2d Martens Decl. ¶ 2, Ex. 6 ("4/08 Ledcor Letter"); Claim Notes

7   at 6.)  Cornhusker had retained R. Scott "Bud" Fallon and the firm of Fallon & McKinley

8   as counsel to represent SQI against Ledcor's claims.  (*See* Corn. Mot. at 13; Corn. Resp.

9   (Dkt. # 84) at 5; 2d Martens Decl.  ¶ 2, Ex. 9; Messineo Decl. (Dkt. # 85) ¶¶ 5-6, Ex. A.)

10  Mr. Fallon represented SQI at the May 2008 mediation but apparently without prior

11  settlement authority from Cornhusker.  (*See* 2d Martens Decl. ¶ 2, Ex. 7; Def. Mot. at

12  12.)  In an internal email sent prior to the May 2008 mediation, Cornhusker employee

13  Tom Dashel stated that the mediation "[s]ounds like . . . [a] waste of time. . . . If there is

14  no involvement of the of the [sic] HOA, this is meaningless."  (2d Martens Decl. ¶ 2, Ex.

15  9.)

16       Two more mediations appear to have taken place in 2009 and another occurred in

17  October 2010, all of which defense counsel attended—again, apparently without prior

18  settlement authority from Cornhusker.  (*See* 2d Martens Decl. ¶ 2, Ex. 7, Ex. 11.)  After

19  the 2010 mediation, Mr. Fallon wrote to Mr. Dashel explaining, "I checked into the

20  mediation on June 8, several times, but the mediator and the parties were never ready to

21  deal with the claims against SQI.  I briefly explained our position to the mediator . . . that

22  the plaintiff's demand to us, based on 'practical assumptions,' was simply a percentage of

1  the overall top of the building repair costs and was a non-starter for us in terms of real

2  settlement discussion."  (Messineo Decl. ¶ 9, Ex. D ("6/9/10 Fallon Letter"); *see also id.*

3  ¶ 10, Ex. E.)[9]  Mr. Dashel responded:  "Payment of anything is a non starter [sic] for us

4  . . . Keep me posted Bud."  (2d Martens Decl. ¶ 2, Ex. 12.)  The parties point to no other

5  information regarding what occurred at these mediations.[10]

6  A final mediation took place in March 2014.  By this point, Admiral and Ledcor

7  had settled the ACOA Suit (*see* Admiral Ans. ¶ 3.11 (noting that the ACOA suit settled

8  in July 2009)), and Cornhusker had obtained a summary judgment ruling in the Coverage

9  Suit that Ledcor was not an additional insured under SQI's policies with Cornhusker (*see*

10  1st Sparling Decl. ¶¶ 12-13, Exs. K-L).  During the March 2014 mediation, Cornhusker's

11  coverage counsel, D. Bradley Hudson, attempted to negotiate a settlement that would

12  include a $71,786.00 contribution from Cornhusker, a similar contribution from another

13  

14  

15  [9] A letter from Mr. Fallon to Mr. Dashel before the 2010 mediation indicates that SQI had not been afforded time to participate in prior mediations as well.  (*See* Messineo Decl. ¶ 7, Ex. B ("4/12/10 Fallon Letter") at 1 ("The parties are now talking about scheduling a mediation.  They are . . . talking about the dates of June 7-8, 2010.  It is my recommendation that we participate in the mediation.  I do first want to get a commitment from the new plaintiffs' counsel that they will actually deal with the subcontractors this time.").)

16  

17  

18  [10] Defendants point to evidence in the record indicating that Cornhusker received a settlement demand prior to one of the 2009 mediations.  (*See* Def. Mot. at 13 (citing 2d Martens Decl. ¶ 2, Ex. 10 ("6/10/09 Ledcor Letter")).)  Defendants then state, "There is no notation in the Claims Notes that Cornhusker communicated this settlement offer to SQI.  This is a further violation of Cornhusker's enhanced obligation of fair dealing to its insured, . . . ."  (Def. Mot. at 13 (internal citation and footnote omitted).)  The problem with this argument is that Ledcor addressed its settlement demand not just to Cornhusker but also to Mr. Fallon, SQI's defense counsel.  (6/10/09 Ledcor Letter at 1.)  Defendants bring no claim against Mr. Fallon, nor do they suggest at any point that Mr. Fallon failed to communicate settlement offers to SQI or otherwise violated any obligation to SQI.  As such, the court disregards Defendants' suggestion that Cornhusker withheld settlement offers from SQI.

19  

20  

21  

22  

ORDER- 8

insurer, and a release of SQI from further liability.  (*See* 2d Gardner Decl. (Dkt. # 71) ¶¶ 3-4, Ex. A ("Hudson Letter") at 1; Hudson Decl.[11] (Dkt. # 86) ¶¶ 6-14.)  Ledcor did not respond to that settlement offer.  (*See* Hudson Letter at 1; Hudson Decl. ¶ 11.)  Cornhusker's counsel also informed the mediator that if SQI agreed to have a judgment entered against it, Cornhusker would agree to pay $71,786.00, provided Ledcor gave Cornhusker a full release.  (Hudson Letter at 1.)

The parties dispute how Cornhusker arrived at the $71,786.00 figure.  Defendants argue that $71,786.00 represents Cornhusker's estimate of the low end of SQI's exposure, and that Cornhusker estimated that SQI might be liable for as much as $937,717.00.  (*See* Def. Mot. at 14.)  In support of this position, Defendants point to two documents in the claims file, both of which appear to be detailed calculations of the values at stake in the Contractor Suit.  (2d Martens Decl. ¶ 2, Exs. 13 (listing $71,786.00 as the final number),14 (listing $937,717.00 as the final number).)  Cornhusker responds that the $937,717.00 figure comes from a preliminary draft and does not represent Cornhusker's estimate of SQI's exposure, and that the $71,786.00 figure constitutes Cornhusker's estimate of the covered amount of SQI's liability.  (*See* Corn. Resp. at 7-8;

---

[11] Defendants argue that Ms. Messineo's and Mr. Hudson's declarations are inadmissible because Cornhusker did not identify these individuals during its initial disclosures.  (Def. Reply (Dkt. # 87) at 5.)  The record reveals, however, that Cornhusker identified both Ms. Messineo and Mr. Hudson in its response to SQI's first set of interrogatories (*see* Dkt. # 64 at 14-15), and that Defendants identified Ms. Messineo as a potential witness in their initial disclosures (*see* Dkt.   # 76-1 at 4).  As such, the court finds that Defendants have not suffered prejudice from Cornhusker's failure to identify these witnesses in its initial disclosures, and therefore Ms. Messineo's and Mr. Hudson's declarations are admissible.

1   Messineo Decl. ¶¶ 11-17, Exs. F-G.)  Neither of the relevant documents makes clear on

2   its face what exactly it represents.

3          Following the failed March 2014 mediation, Mr. Hudson sent a letter to Devon

4   Thurtle Anderson, SQI's recently retained personal counsel.  (*See* Hudson Letter; 2d

5   Gardner Decl. ¶ 2; Def. Reply at 3-4.)  Mr. Hudson informed Ms. Anderson of what he

6   had done at the mediation.  (Hudson Letter at 1.)  He also reiterated that Cornhusker did

7   not believe its policies provided coverage for the losses at issue in the Contractor Suit

8   primarily due to the residential construction and "your work" exclusions.[12]  (*See id.* at 1-

9   4.)  Nevertheless, Cornhusker's counsel assured Ms. Anderson that Cornhusker intended

10  to continue to defend SQI and did not intend to initiate a lawsuit against SQI to determine

11  coverage.  (*Id.* at 4.)  He also stated his belief that Ledcor and Admiral's claims against

12  SQI far exceeded SQI's actual exposure.  (*Id.*)[13]

13         In April 2014, SQI settled with Ledcor and Admiral.  (*See* 2d Martens Decl. ¶ 2,

14  Ex. 16 ("Stip. Judgment").)  Acting through Ms. Anderson, SQI agreed to a consent

15  judgment in the amount of $747,785.00 and assigned its rights against Cornhusker to

16  Ledcor and Admiral in exchange for a covenant not to execute.  (*See* Stip. Judgment; 1st

17  Sparling Decl. ¶ 11, Ex. J ("IFCA Notice").)  Defendants' settlement signaled the

18  ─────────────────

19     [12] In quoting the residential construction exclusion, the letter included the language regarding "original construction" but left out the language pertaining to "repairs."  (Hudson Letter at 2.)

20
21     [13] Defendants attempt to characterize Mr. Hudon's letter to Ms. Anderson as threatening "SQI with a revocation of coverage for entering into a covenant judgment."  (Def. Mot. at 15 & n.12; Def. Reply at 9-10; 2d Gardner Decl. ¶¶ 3-4.)  The court has carefully examined Mr.

22  Hudson's letter and finds that it cannot be reasonably interpreted in the manner Defendants suggest.

ORDER- 10

1   beginning of this action.  Not only did SQI assign its rights against Cornhusker and

2   obtain a covenant not to execute, but Defendants gave notice to Cornhusker of their intent

3   to file claims against Cornhusker under Washington's Insurance Fair Conduct Act

4   ("IFCA"), RCW 48.30.15.  (*See id.*)  Anticipating impending litigation against Admiral

5   and Ledcor as SQI's assignees, Cornhusker filed this action in federal court seeking a

6   declaration that its policies do not provide coverage for the losses involved in the

7   Contractor Suit.  (*See* Compl. (Dkt. # 1).)

8          SQI, Admiral, and Ledcor have each filed an answer and made multiple

9   counterclaims against Cornhusker.  SQI's answer asserts counterclaims for breach of

10  contract (duty to indemnify), bad faith, violation of Washington's Consumer Protection

11  Act ("CPA"), RCW 19.86 *et seq.*, and violation of IFCA.  (*See* SQI Ans. (Dkt. # 16) ¶ 4.)

12  Admiral's answer contains counterclaims for breach of contract (duty to indemnify

13  Admiral as an additional insured) and violation of the CPA.  (*See* Admiral Ans. ¶ 4.)

14  Ledcor's answer alleges breach of contract (duty to defend and indemnify Ledcor as an

15  additional insured), bad faith, and violation of the CPA.  (*See* Ledcor Ans. (Dkt. # 18)

16  ¶ 4.)  All three Defendants assert a counterclaim for reformation.  (*Id.* ¶ 5.1; Admiral

17  Ans. ¶ 5.1; SQI Ans. ¶ 5.1.)

18         The court has already addressed coverage issues once in this case.  On November

19  13, 2014, Cornhusker filed a motion for summary judgment attempting to establish that

20  Cornhusker has no duty to indemnify SQI or its assignees because the residential

21  construction exclusion bars coverage in all of SQI's policies with Cornhusker.  (*See* MSJ

22  (Dkt. # 29).)  Defendants resisted that motion on multiple grounds, including that the

1   PCOH constitutes separate coverage to which the residential construction exclusion does

2   not apply.  (*See* MSJ Resp. at 10.)  The court granted Cornhusker's motion in part and

3   denied it in part.  (*See* 3/30/15 Order.)  Specifically, the court held that (1) PCOH falls

4   within the policies' BI/PD Coverage and is subject to that coverage's exclusions and

5   limitations; (2) the residential construction exclusions in the first two policies preclude

6   coverage under those policies; (3) the third version of the residential construction

7   exclusion places the burden on Cornhusker to show that any otherwise covered property

8   damage occurring between May 2005 and May 2006 arose out of "original construction";

9   and (4) a genuine dispute of fact remained regarding the applicability of that version of

10  the residential construction exclusion.  (*See id.* at 15-26.)

11          On July 23, 2015, the parties filed the instant motions for summary judgment.

12  (*See* Corn. Mot.; Def. Mot.)  Cornhusker's motion seeks dismissal of Defendants'

13  contractual and extra-contractual counterclaims and a declaration that its policies provide

14  no coverage for the losses at issue in the Contractor Suit.  (*See* Corn. Mot. at 1-2.)

15  Defendants oppose Cornhusker's motion and bring their own motion in which they ask

16  the court to grant summary judgment in their favor on SQI's assigned extra-contractual

17  claims for bad faith, violation of the CPA, and violation of IFCA.  (*See* Def. Resp; Def.

18  Mot. at 2.)  The parties' cross-motions for summary judgment are now before the court.

19                      **III.    DISCUSSION**

20  **A.    Summary Judgment Standard**

21          Summary judgment is appropriate if the evidence, when viewed in the light most

22  favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

1    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

2    P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*,

3    477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

4    there is no genuine issue of material fact and that he or she is entitled to prevail as a

5    matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

6    then the nonmoving party "must make a showing sufficient to establish a genuine dispute

7    of material fact regarding the existence of the essential elements of his case that he must

8    prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.  A fact

9    is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*,

10   477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient

11   evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods.,*

12   *Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

13         In determining whether the fact-finder could reasonably find in the nonmoving

14   party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

15   party, and it may not make credibility determinations or weigh the evidence."  *Reeves v.*

16   *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, the

17   nonmoving party "must do more than simply show that there is some metaphysical doubt

18   as to the material facts . . . .  Where the record taken as a whole could not lead a rational

19   trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v.*

20   *Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

21   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  The court may

22   only consider admissible evidence when ruling on a motion for summary judgment.  *Orr*

1   *v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).  "Legal memoranda and

2   oral argument are not evidence and do not create issues of fact capable of defeating an

3   otherwise valid summary judgment."  *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir.

4   1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir.

5   2003) ("Conclusory allegations unsupported by factual data cannot defeat summary

6   judgment.").

7   **B.      Cornhusker's Motion**

8         The court begins with Cornhusker's motion.  As noted above, Cornhusker's

9   motion seeks dismissal of Defendants' contractual and extra-contractual counterclaims,

10  dismissal of Defendants' counterclaims for reformation, and a declaration that the Policy

11  provides no coverage for the losses at issue in the Contractor Suit.  (*See* Corn. Mot. at 1-

12  2.)  In support of its motion, Cornhusker makes the following arguments:  (1) SQI cannot

13  independently assert any claims against Cornhusker because SQI has assigned all such

14  claims to Admiral and Ledcor (*see* Corn. Mot. at 16); (2) the Policy provides no coverage

15  for the consent judgment in the Contractor Suit because Defendants can offer no evidence

16  of any property damage that occurred within the policy period and that does not also fall

17  within the residential construction, your work, or injury or damage in progress exclusions

18  (*see id.* at 9, 17-19); (3) Defendants cannot show that Cornhusker acted in bad faith (*see

19  id.* at 19-20), (4) violated the CPA (*see id.* at 21), or (5) violated IFCA (*see id.* at 20-21);

20  (6) Admiral's and Ledcor's extra-contractual counterclaims are time barred (*see id.* at 26-

21  //

22  //

ORDER- 14

27); and (7) Defendants' have no evidence to support their reformation claims (*see id.* at 27-28).[14] The court addresses each argument in turn.

### 1.  SQI's Assigned Claims

Pursuant to Defendants' settlement agreement, SQI assigned "any and all of its rights and claims against . . . Cornhusker . . . relating to the Project[.]"  (Stip. Judgment at 5.)  SQI has since filed an answer in this lawsuit in which it asserts counterclaims for breach of contract (duty to indemnify), bad faith, violation of the CPA, and violation of IFCA.  (*See* SQI Ans. ¶ 4.)  Cornhusker attacks those counterclaims on the bases that SQI cannot independently assert any counterclaims against it and, insofar as Ledcor and Admiral assert counterclaims as SQI's assignees, Defendants lack evidence to support their counterclaims.

### a.  As an individual party, SQI has no remaining claims against Cornhusker

Defendants concede that following the assignment of its rights SQI cannot independently assert any claims against Cornhusker.  (Def. Resp. at 6.)  Only Admiral and Ledcor, as SQI's assignees, can now assert the contractual and extra-contractual claims that SQI previously held.  (*See id.*; Stip. Judgment.)  The court therefore dismisses whatever counterclaims SQI may have been attempting to assert as an individual party.

### b.  Cornhusker did not breach its duty to indemnify SQI

Cornhusker next argues that the Policy provides no coverage related to the Project because Defendants can offer no evidence of any property damage that occurred within

---

[14] Cornhusker makes several additional arguments not listed here (*see* Corn. Mot. at 2); however, the court need not reach such arguments to dispose of Cornhusker's and Defendants' motions.

1 | the policy period and that does not also fall within the residential construction, your

2 | work, or injury or damage in progress exclusions.  (*See* Corn. Mot. at 9, 17-19.)  The

3 | court agrees.

4 |     The interpretation of an insurance policy is a question of law for the court.

5 | *Overton v. Consolidated Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002).  Insurance policies are

6 | contracts, which are construed as a whole with the terms interpreted as they would be

7 | understood by an average person purchasing insurance.  *Id.*  If the language of an

8 | insurance policy is clear and unambiguous, the court must enforce it as written and may

9 | not create ambiguity where none exists.  *Am. Nat'l Fire Ins. Co. v. B&L Trucking &*

10 | *Constr. Co.*, 951 P.2d 250, 256 (Wash. 1998).

11 |     The determination of whether coverage exists involves a burden-shifting

12 | framework.  *See McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1003-04

13 | (Wash. 1992).  The insured bears the initial burden to demonstrate that the loss falls

14 | within the scope of the policy's insured losses.  *See id.*  If the insured makes that

15 | demonstration, the insurer can avoid coverage by showing that specific policy language

16 | excludes the loss.  *See id.* at 1004.  Exclusions from coverage are strictly construed

17 | against the insurer because they are contrary to the protective purpose of insurance.

18 | *Stuart v. Am. States Ins. Co.*, 953 P.3d 462, 464 (Wash. 1998).

19 |     As discussed above, the Policy covers property damage that occurs during the

20 | policy period—from May 2005 to May 2006.  (Policy at 4.)  Even where such property

21 | damage occurs, however, the Policy excludes from coverage property damage that arises

22 | out of the "original construction" of a condominium (*id.* at 24), as well as property

ORDER- 16

1   damage to the insured's own work (*id.* at 7; *see also id.* at 22).  The court's prior

2   summary judgment order establishes that these exclusions and limitations apply to the

3   Policy's PCOH provisions.  (*See* 3/30/15 Order at 15-19.)

4           Defendants offer only the following evidence to support their assertion that

5   covered property damage occurred during the policy period.  First, Mark Gardner, the

6   Vice President of SQI, attests that at the time SQI completed its repair work in June 2005

7   both the roof of the Project and all its surrounding structures were free from property

8   damage that could have resulted from the original construction of the roof.  (3d Gardner

9   Decl. ¶¶ 4-5.)  Second, Defendants point to the report that Cornhusker asked John

10  Colvard to prepare after Cornhusker received Ledcor's tender.  (*See* Colvard Report

11  (cited by Def. Resp. at 2, 9).)  That report references several roof-related construction

12  defects, including water trapped between roofing plies.  (*See* Colvard Report at 7-8.)

13  From this evidence, Defendants' reason that SQI's repair work must have been defective,

14  and [g]iven the known defects of SQI's repair work, it is virtually certain that water

15  would have penetrated the roof membrane and started causing property damage the first

16  time it rained following the completion of the repair work."  (Def. Resp. at 10.)

17  Defendants then observe that June 2005 was a rainy month and conclude that "the

18  'occurrence' triggering coverage under the 2005-2006 policy was likely immediately

19  after the completion of the May 2005 repairs."  (*Id.*)

20          Defendants fall short of avoiding summary judgment.  Even viewing the above

21  evidence in the light most favorable to Defendants and indulging Defendants' rather large

22  inferential leaps, *see Reeves*, 530 U.S. at 150, a fact-finder could conclude at most that

1    SQI defectively repaired the roof thereby leading to the problems described in Mr.

2    Colvard's report (*see* Colvard Report at 7-8).  Those problems, however, are defects with

3    the roof itself—the part of the Project that SQI installed and repaired.  (*See id.*; Ledcor

4    Compl. ¶¶ 12-13; 1st Gardner Decl. ¶¶ 2-4; 3d Gardner Decl. ¶¶ 2-4; 2d Sparling Decl.

5    ¶¶ 5, 11, Exs. D, J.)  Thus, even if those problems constitute property damage, such

6    property damage is, as Cornhusker points out, damage to SQI's own work and therefore

7    not covered pursuant to the "your work" exclusion.  (*See* Corn. Mot. at 17-10 & n.9;

8    Policy at 7, 22.)  Defendants point to no evidence of property damage to anything other

9    than the roof that occurred between May 2005 and May 2006.[15]  Accordingly, the court

10   grants Cornhusker's motion on the issue of coverage.

11          Defendants attempt to forestall this result by arguing that coverage nevertheless

12   exists under the PCOH provisions because the property damage to the roof occurred after

13   SQI finished its work on the roof.  (*See* Def. Resp. at 10-13.)  To reach this conclusion,

14   Defendants repeat an argument they made in response to Cornhusker's previous motion

15   for summary judgment—namely, that the PCOH constitutes separate coverage to which

16   _____

17          [15] Defendants cite to another portion of Mr. Colvard's report, claiming that it offers
     further evidence of water intrusion and property damage.  (*See* Def. Resp. at 2 (citing Colvard
18   Report at 2.)  Yet the cited portion describes an incident in which the source of the water damage
     was determined to be a plumbing issue, not the roof.  (*See* Colvard Report at 2.)  In addition, the
19   court observes that at one point in his report Mr. Colvard describes the contents of a different
     report that ACOA's experts prepared.  (*See* Colvard Report at 7-8.)  To the extent Mr. Colvard
20   confirms the findings of the ACOA report with his own observations, the court considers Mr.
     Colvard's statements.  To the extent Mr. Colvard merely relays what the ACOA report says, Mr.
21   Colvard's description is inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802.  Defendants have
     not included the ACOA experts' report in their summary judgment submissions, and in fact have
22   successfully objected to Cornhusker's citation to the deposition testimony of one of the ACOA
     experts.  (*See* Def. Resp. at 8 n.1); *supra* note 8.

ORDER- 18

1  the exclusions and limitations under the Policy's BI/PD Coverage do not apply.  (*See id.*

2  at 11-13.)  The court analyzed and rejected that argument in its order on Cornhusker's

3  prior motion.  (*See* 3/30/15 Order at 15-19.)  Defendants offer no reason to reconsider

4  that ruling and in fact fail to acknowledge that they are repeating a previously rejected

5  argument.  (*See* Def. Mot. at 10-13.)  The court stands on its prior decision and therefore

6  concludes that the "your work" exclusion applies to the PCOH provisions.[16]  As such, the

7  court concludes that the Policy provides no coverage for any losses related to the Project.

8  *c.  Cornhusker did not act in bad faith with respect to SQI*

9       In Washington, bad faith handling of an insurance claim is a tort and is analyzed

10  under general tort principles:  duty, breach of that duty, and damages proximately caused

11  by the breach.  *Mut. Of Enumclaw Ins. Co. v. Dan Paulson Constr. Co.*, 169 P.3d 1, 8

12  (Wash. 2007).  To establish bad faith, an insured is required to show that the breach was

13  unreasonable, frivolous, or unfounded.  *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126

14  (Wash. 1998).  Ordinarily, whether an insurer acts in bad faith is a question of fact for the

15  jury, unless reasonable minds could reach but one conclusion.  *See Smith v. Safeco Ins.*

16  *Co.*, 78 P.3d 1274, 1277 (Wash. 2003).  Context is critical to determining whether an

17  ───────────────

18  [16] The court also rejects Defendants related contention that the PCOH provides coverage for property damage that occurs after the policy period provided such damage arises out of work performed within the policy period.  (*See* Def. Mot. at 11-12.)  The Policy contains no support

19  for this contention.  The PCOH covers "property damage" (Policy at 21), and the Policy applies to property damage only if it "occurs during the policy period" (*id.* at 4).  Nothing in the PCOH

20  suggest that its coverage is triggered by the timing of the work in question rather than the damage in question.  (*Id.* at 21.)  Nor does such an interpretation render the PCOH coverage illusory, as Defendants suggest.  (*See* Def. Mot. at 12.)  Defendants acknowledge that over 11

21  months of the policy period remained after SQI completed its 2005 repairs.  (*Id.* at 7.)  Any property damage occurring during those 11 months might have come under the coverage of the

22  PCOH provisions.

1   insurer committed bad faith.  *See Am. Mfrs. Mut. Ins. Co. v. Osborn*, 17 P.3d 1129, 1236

2   (Wash. Ct. App. 2001); *Keller v. Allstate Ins. Co.*, 915 P.2d 1140, 1145 (Wash. Ct. App.

3   1996) ("To determine whether [an insurer] acted reasonably, fairly, or deceptively, it is

4   necessary to consider the circumstances surrounding the allegedly improper act.").

5         Furthermore, the duty of good faith "is broad and all-encompassing, and is not

6   limited to an insurer's duty to pay, settle, or defend."  *St. Paul Fire and Marine Ins. v.*

7   *Onvia, Inc.*, 196 P.3d 664, 669 (Wash. 2008).  Thus, even where there would be no

8   coverage or right to a defense under the policy terms, if an insurer mishandles a claim in

9   bad faith, a cause of action based on this conduct remains viable.  *Id.* at 668.

10        An insurer has an enhanced obligation to its insured when the insurer is defending

11  under a reservation of rights.  *Safeco Ins. Co. v. Butler*, 823 P.2d 499, 503 (Wash. 1992)

12  (citing *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1137 (1986)).  The insurer

13  can discharge this obligation by satisfying four criteria:

14        First, the company must thoroughly investigate the cause of the insured's
          accident and the nature and severity of the plaintiff's injuries. Second, it
15        must retain competent defense counsel for the insured. Both retained
          defense counsel and the insurer must understand that only the *insured* is the
16        client. Third, the company has the responsibility for fully informing the
          insured not only of the reservation-of-rights defense itself, but of *all*
17        developments relevant to his policy coverage and the progress of his
          lawsuit. . . . Finally, an insurance company must refrain from engaging in
18        any action which would demonstrate a greater concern for the insurer's
          monetary interest than for the insured's financial risk.
19
20  *Tank*, 715 P.2d at 1137.  If an insured establishes that its insurer acted in bad faith while

21  defending under a reservation of rights, a rebuttable presumption of harm arises.  *Butler*,

22

ORDER- 20

1   823 P.2d at 504-05.  If the insurer fails to rebut that presumption and the insured prevails

2   on the bad faith claim, the insurer is estopped from denying coverage.  *Id.* at 505-06.

3         Defendants argue that Cornhusker acted in bad faith in six respects:  by (1)

4   misrepresenting pertinent policy provisions; (2) failing to engage in settlement

5   negotiations in good faith; (3) failing to conduct a reasonably prompt investigation; (4)

6   failing to render a decision on coverage within a reasonable period of time; (5)

7   improperly comingling its files related to coverage and claims; and (6) unreasonably

8   failing to share its claims file with Defendants during discovery in this case.  (*See* Def.

9   Mot. at 2-3, 10-15, 23-25.)  The court addresses each of these arguments in turn.

10              i.   *Misrepresentation of policy provisions*

11        Pursuant to WAC 284-30-330(1), an insurer's misrepresentation of pertinent facts

12   or insurance policy provisions during the settlement of claims constitutes an unfair

13   method of competition or deceptive act or practice in the business of insurance.  WAC

14   284-30.330(1).  Defendants contend that Cornhusker misrepresented pertinent policy

15   provisions on two occasions.  (*See* Def. Mot. at 11-12.)  First, Defendants point to

16   Cornhusker's reservation of rights letter, in which Cornhusker failed to specifically

17   discuss the so-called "repairs exception" to the Policy's residential construction exclusion

18   and instead quoted the entire exclusion, including the "repairs exception," and then stated

19   that "[t]he Residential Construction Exclusions specifically exclude coverage for

20   residential condominiums."  (*Id.* at 11; RoR at 11-12.)  Second, Defendants rely on Mr.

21   Hudson's letter to SQI's personal counsel, wherein Mr. Hudson quoted the residential

22   construction exclusion but omitted the language regarding repairs.  (Def. Mot. at 11-12;

ORDER- 21

1    Hudson Letter at 2.)  Defendants argue that this conduct violates WAC 284-30-330(1)

2    and amounts to bad faith.  (Def. Mot. at 11-12; Def. Reply at 3-4.)

3           Defendants direct the court to only one case holding that a violation of WAC 284-

4    30-330(1) amounted to bad faith.  (*See* Def. Mot. at 7-8 (citing *Anderson v. State Farm*

5    *Mut. Ins. Co.*, 2 P.3d 1029, 1034 (Wash. Ct. App. 2000)).  In that case, the Washington

6    Court of Appeals held that an insurer acted in bad faith by failing to disclose the

7    existence of UIM coverage when specific information before the insurer established that

8    UIM coverage would likely apply, and the insurer had no reasonable basis for

9    discounting that information.  *See Anderson*, 2 P.2d at 1034.  Thus, an insurer that omits

10   pertinent information about the policy is guilty of bad faith only if that omission was

11   unreasonable in light of the circumstances existing at the time.  *See id.*; *Pac. Coast*

12   *Container, Inc. v. Royal Surplus Lines Ins. Co.*, No. C08-0278MJP, 2008 WL 2705588,

13   at *7 (W.D. Wash. July 8, 2008); *see also HB Dev., LLC v. W. Pac. Mut. Ins.*, No. 2:13-

14   CV-5050-RMP, 2015 WL 506646, at *16 (E.D. Wash. Feb. 6, 2015).

15          Even viewing the facts in the light most favorable to Defendants, *see Reeves*, 530

16   U.S. at 150, no reasonable fact-finder could conclude that Cornhusker misrepresented

17   pertinent policy provisions in bad faith, *see Anderson*, 2 P.3d at 1034.  To begin, the facts

18   do not establish that Cornhusker's conduct amounts to a misrepresentation.  Cornhusker's

19   reservation of rights letter fails to mention the "repairs exception" in its discussion of the

20   residential construction exclusions, but on the previous page of the letter, Cornhusker

21   quotes the entire residential construction exclusion from the Policy, including the "repairs

22   exception" and the following title:  "**EXCLUSION – CERTAIN RESIDENTIAL**

1    **CONSTRUCTION [–] EXCEPT FOR REMODEL OR REPAIR**.”  (RoR at 11-12 (all

2    emphasis in original).)  Mr. Hudson's letter also includes the full title of the Policy's

3    residential construction exclusion, and although the letter does not quote the "repairs

4    exception," it quotes the equally important language regarding "original construction."

5    (Hudson Letter at 2; *see* 3/30/15 Order at 22-24 (explaining the importance of the words

6    "original construction" in interpreting the residential construction exclusion).)

7    Defendants offer no authority for their assertion that Cornhusker's failure to specifically

8    discuss the "repairs exception" amounts to a misrepresentation of the Policy, despite

9    Cornhusker's quotation of the relevant language.

10          Furthermore, even if the lack of specific discussion amounts to a

11   misrepresentation, Defendants fail to create a genuine issue of fact that Cornhusker's

12   omission was unreasonable under the circumstances.  *See Anderson*, 2 P.3d at 1034;

13   *Keller*, 915 P.2d at 1145; *Pac. Coast Container, Inc.*, 2008 WL 2705588, at *7.

14   Defendants' sole evidence in this regard is that Cornhusker knew that SQI had performed

15   repairs in May 2005.  (*See* Claim Notes at 1.)  From this single piece of evidence,

16   Defendants argue that Cornhusker should have known that it might owe coverage under

17   the repairs exception.  (*See* Def. Mot. at 11-12.)  Yet Defendants point to no evidence that

18   Cornhusker or anyone else involved in the underlying dispute at that time thought that

19   SQI's 2005 repairs might be responsible for covered property damage.  *See Osborn*, 17

20   P.3d at 1236; *Anderson*, 2 P.3d at 1034 (noting that UIM coverage would likely apply if

21   the insured's account of events was accurate).  Ledcor's tender focuses on SQI's initial

22   construction of the roof and makes no mention of the 2005 repairs.  (*See* Ledcor Tender.)

ORDER- 23

Moreover, while ACOA's list of known construction defects and Mr. Colvard's report mention problems with the roof in 2007, neither document indicates that the 2005 repairs were responsible for property damage to another part of the Project.[17]  (*See* ACOA Defect List at 2-3; Colvard Report at 7-8.)  Accordingly, summary judgment is appropriate against Defendants' counterclaim for bad faith misrepresentations.

### ii. *Failure to engage in settlement negotiations in good faith*

An insurer defending under a reservation of rights has a duty to make a good faith effort to settle a claim, including an obligation to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available.  *Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash.*, 254 P.3d 939, 944-45 (Wash. Ct. App. 2011).  The insured, however, retains authority over the ultimate choice regarding settlement because the insured may have to pay the settlement.  *Tank*, 715 P.2d at 1138.  Indeed, the insurer's obligations in this context do not necessarily require the insurer to pay the settlement or prohibit the insurer from considering coverage issues when deciding how much to contribute to a settlement.  *See Specialty Surplus Ins. Co. v. Second Chance, Inc.*, 412 F. Supp. 2d 1152, 1165-66 & n.4 (W.D. Wash. 2006); Thomas V. Harris, *Washington Insurance Law* § 19.05 (3d ed. 2010).  The insurer acts in good faith as long as its conduct is reasonable and does not demonstrate a greater concern for its own financial interest than its insured's financial risk.  *See id.*; *Tank*, 715 P.2d at 1137-38.

---

[17] As discussed above, the problems with the roof discovered in 2007 are, at most, damage to the roof itself and therefore not covered pursuant to the "your work" exclusion.  *See supra* Part III.B.1.b.  That exclusion also appears in Cornhusker's reservation of rights letter and in Mr. Hudson's letter to SQI's personal counsel.  (*See* RoR at 10-11; Hudson Letter at 2-4.)

1    Here, as in all cases of alleged bad faith, context is important to a determination of

2    reasonableness.  *See Osborn*, 17 P.3d at 1236; *Keller*, 915 P.2d at 1145; *Truck Ins. Exch.*

3    *of Farmers Ins. Grp. V. Century Indem. Co.*, 887 P.2d 455, 460 (Wash. Ct. App. 1995).

4         Defendants present the following evidence of bad faith in the settlement process:

5    (1) Cornhusker did not give SQI's defense counsel settlement authority prior to the May

6    2008 mediation and referred to such mediation as a "waste of time" in an internal

7    communication; (2) Cornhusker did not give counsel prior settlement authority with

8    respect to the two mediations that occurred in 2009; (3) Cornhusker did not give counsel

9    settlement authority before the 2010 mediation and later indicated that it viewed payment

10   as a non-starter; and (4) Cornhusker offered to contribute only $71,786.00 at the 2014

11   mediation, despite some indication that it might have believed SQI's exposure was as

12   much as $937,717.00.  (*See* Def. Mot. at 3, 12-15); *supra* at 7-10.  Although these acts

13   might be unreasonable under the right circumstances, Defendants point to nothing to

14   show that such circumstances existed in this case.  *See Osborn*, 17 P.3d at 1236; *Keller*,

15   915 P.2d at 1145.  In fact, Defendants point to no evidence of context whatsoever.

16        Furthermore, the contextual evidence in the summary judgment record indicates

17   that Cornhusker acted reasonably.  With respect to the 2008 mediation, Ledcor's

18   invitation stated that Ledcor wanted to discuss SQI's obligation to defend and indemnify

19   Ledcor for the claims Ledcor then faced in the ACOA Suit.  (*See* 4/08 Ledcor Letter at 1-

20   2.)  Cornhusker employee Tom Dashel referred to that mediation as likely being a "waste

21   of time"; however, his statement links that view to the fact that ACOA would not be

22   participating in the mediation.  (*See* 2d Martens Decl. ¶ 2, Ex. 9 ("If there is no

1   involvement of the . . . HOA, this is meaningless.").)  Defendants present no evidence

2   showing that Mr. Dashel's dim view of the 2008 mediation's utility was unjustified or

3   unreasonable, nor do they offer any evidence linking this view to a lack of concern for

4   SQI's interest.  *See Tank*, 715 P.2d at 1137-38.

5          In addition, the record shows that at least through 2010 SQI's defense counsel,

6   whose good faith in relation to SQI is not challenged here, believed that SQI had very

7   little liability exposure, and that Ledcor and Admiral's demands to SQI were merely pro

8   rata allocations of ACOA's claimed damages unsupported by evidence of SQI's

9   responsibility for those damages.  (*See* 6/9/10 Fallon Letter; 4/12/10 Fallon Letter;

10  Messineo Decl. ¶ 8, Ex. C ("11/5/10 Fallon Letter"); *see also* Messineo Decl. ¶ 10, Ex.

11  E.)  He recommended attending the 2010 mediation to explain that SQI was not liable,

12  and he indicated that SQI shared his view of liability.  (*See* 4/12/10 Fallon Letter at 2

13  ("My recommendation is that we participate [in the June 7, 2010, mediation] as we did

14  last time to have our client and expert explain why there is no liability on the part of SQI

15  and then see what develops.").)  The record also indicates that in the 2009 and 2010

16  mediations Admiral and Ledcor did not even have time to mediate with SQI.  (*See* 6/9/10

17  Fallon Letter; 4/12/10 Fallon Letter at 1.)  This contextual evidence casts Cornhusker's

18  approach to the mediations as reasonable, not frivolous, unfounded, or self-interested.

19  *See Osborn*, 17 P.3d at 1236; *Keller*, 915 P.2d at 1145.  Furthermore, although

20  Defendants make much of Cornhusker's failure to give counsel settlement authority prior

21  to the 2008, 2009, and 2010 mediations (*see, e.g.*, Def. Mot. at 12-13), Defendants offer

22

1 no authority for the proposition that such conduct, by itself, constitutes evidence of

2 unreasonable behavior, and the court is aware of none.

3   Finally, the court rejects Defendants' contention that Cornhusker's offer at the

4 2014 mediation was unreasonably low and indicative of bad faith.  (*See* Def. Mot. at 13-

5 15.)  Washington law contains almost no guidance regarding an insurer's duty to settle

6 and, in particular, to contribute funds to settlement in the context of a defense under a

7 reservation of rights.  *See Second Chance, Inc.*, 412 F. Supp. 2d at 1165-66 & n.4; Harris,

8 *Washington Insurance Law* § 19.05.  Thus, as Judge Coughenour recognized in *Second*

9 *Chance, Inc.*, an insurer's duty in this context is defined by *Tank*'s general requirement

10 that the insurer refrain from conduct demonstrating a greater concern for its own financial

11 interest than its insured's financial risk.  *See Second Chance, Inc.*, 412 F. Supp. 2d at

12 1165-66 & n.4 (citing *Tank*, 715 P.2d at 1137-38).

13   Although the lack of clarity in the law gives the court pause, summary judgment is

14 nevertheless appropriate here.  Nothing in *Tank* requires insurers in this context to ignore

15 whether coverage exists under their policies.  *See Tank*, 715 P.2d at 1137-38; *Second*

16 *Chance, Inc.*, 412 F. Supp. 2d at 1165-66 & n.4 ("*Tank* permits an insurer at least to

17 consider *whether* it owes a settlement payment when it considers the *amount* of such a

18 payment." (emphasis in original)).  Cornhusker has maintained from the outset of this

19 dispute that coverage likely does not exist due to the residential construction and "your

20 work" exclusions.  (*See* RoR; *see also* Hudson Letter.)  Now, after more than seven years

21 of litigation involving the Project, Defendants still have presented no evidence of covered

22 property damage, and the court has found that no coverage exists under any of the

ORDER- 27

policies.  *See supra* Part III.B.1.b.; (3/30/15 Order at 25.)  Moreover, Defendants have

offered nothing to indicate that at the time of the 2014 mediation Cornhusker had reason

to believe that it owed coverage under the policies.  The court therefore concludes that, at

least in these narrow factual circumstances, Washington courts would not find a triable

issue regarding whether Cornhusker demonstrated a greater concern for its own financial

interests than SQI's financial risk.  *See Tank*, 715 P.2d at 1137-38; *Second Chance, Inc.*,

412 F. Supp. 2d at 1165-66 & n.4; Harris, *Washington Insurance Law* § 19.05.

Accordingly, the court grants summary judgment on and dismisses Defendants'

counterclaim for bad faith breach of the duty to settle.

### iii. <u>Failure to conduct a reasonably prompt investigation</u>

Defendants also attempt to establish bad faith by arguing that Cornhusker failed to

conduct a reasonably prompt investigation into SQI's claims.  (*See* Def. Mot. at 2, 14.)

"'The implied covenant of good faith and fair dealing in the policy should necessarily

require the insurer to conduct any necessary investigation in a timely fashion and to

conduct a reasonable investigation before denying coverage.'"  *Coventry Assocs. v. Am.*

*States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998) (quoting 1 Allan D. Windt, *Insurance*

*Claims & Disputes: Representation of Insurance Companies and Insureds* § 2.05, at 38

(3d ed. 1995)); *Lakehurst Condo. Owners Ass'n v. State Farm Fire & Cas. Co.*, 486 F.

Supp. 2d 1205, 1213 (W.D. Wash. 2007) ("The duty to act in good faith requires the

insurer to act reasonably in . . . investigating the claim.")  Defendants' only evidence of

Cornhusker's unreasonable conduct in this regard is an objection to interrogatories in this

case in which Cornhusker states that it "has not completed its investigation of the facts

1   related to this case, discovery or preparation for trial."  (Def. Mot. at 2, 18 (citing 2d

2   Martens Decl. ¶ 2, Ex. 1 ("Corn. Disc. Resp.") at 1).)

3        This evidence is insufficient to create a genuine dispute of material fact that

4   Cornhusker's investigation was unreasonably delayed.  *See Scott*, 550 U.S. at 380.

5   Defendants point to no case from any jurisdiction where analogous evidence was deemed

6   sufficient to support an inference of unreasonable conduct.  (*See* Def. Mot.; Def. Resp.

7   Def. Reply.)  That absence is not surprising.  Allowing Defendants to present their bad

8   faith investigation claim to a jury based on nothing more than a discovery objection such

9   as Cornhusker's would effectively disable insurers from conducting any discovery or

10  investigation in litigation with insureds.  (*See* Corn. Disc. Resp. at 1.)  As far as the court

11  is aware, the law imposes no such disability on insurers.  Moreover, the record indicates

12  that Cornhusker started investigating the claims against SQI immediately upon receipt of

13  Ledcor's tender, dispatching Mr. Colvard to investigate the roof within a day.  (*See* Claim

14  Notes at 1.)  Mr. Colvard's report was finished within a three weeks (*see* Colvard Report

15  at 1), and within three more weeks Cornhusker sent SQI the reservation of rights letter

16  (*see* RoR at 1).  Defendants point to no evidence or authority to show that such an

17  investigation was unreasonable, particularly in a complex, multi-party construction defect

18  dispute such as existed here.  *See supra* Part II.  Accordingly, the court grants summary

19  judgment in favor of Cornhusker on Defendants' claim of bad faith investigation.

20            *iv.*  *Failure to affirm or deny coverage within a reasonable period of time*

21        In a related vein, Defendants suggest that Cornhusker committed bad faith by

22  failing to make a decision affirming or denying coverage within a reasonable period of

1    time.  (*See* Def. Mot. at 2, 14.)  Washington insurance regulations list "failing to affirm or

2    deny coverage of claims within a reasonable time after fully completed proof of loss

3    documentation has been submitted" as an unfair or deceptive act or practice in the

4    business of insurance.  WAC 284-30-330(5).  Here, Defendants point out Cornhusker's

5    statement in this litigation that it "never made any 'decision to approve or deny benefits

6    to SQI related to the . . . Project and/or the Admiral Way Litigation under the Policies.'"

7    (Corn Disc. Resp. at 2 (quoting SQI's request for production no. 3); *see* Def. Mot. at 2,

8    14, 18.)  Defendants direct the court to no authority showing how a violation of WAC

9    284-30-330(5) intersects with the common law tort of bad faith in the context of a

10   reservation of rights case, and the court's own research has revealed none.

11          Nevertheless, whether or not a violation of WAC 284-30-330(5) constitutes bad

12   faith, Defendants' are not entitled to survive summary judgment on the record before the

13   court.  Defendants point to no evidence and provide no analysis or authority to show that

14   Cornhusker's conduct was unreasonable.  Cornhusker defended SQI under a reservation

15   of rights for roughly six years—from before the beginning of the Contractor Suit, in

16   2008, through April 2014, when SQI settled with Ledcor and Admiral and assigned its

17   rights against Cornhusker to them.  (*See* Corn. Mot. at 13; Corn. Resp. at 5; RoR; 2d

18   Martens Decl. ¶ 2, Ex. 9; Messineo Decl. ¶¶ 5-6, Ex. A; Ledcor Compl.; Stip. Judgment.)

19   Approximately two months after that settlement, Cornhusker unequivocally denied

20   coverage by filing this lawsuit asserting that no coverage exists under the subject policies.

21   (*See* Compl.)  Defendants present nothing from which a fact finder could conclude that

22   Cornhusker's conduct constitutes unreasonable delay.  *See Scott*, 550 U.S. at 380.  The

1    court therefore grants summary judgment in Cornhusker's favor on this aspect of

2    Defendants' bad faith claim.

3         v.   *Improperly comingling defense and coverage files and engaging in*
              *discovery abuses*

4

5         Finally, Defendants contend that Cornhusker committed bad faith by commingling

     its defense and coverage files related to SQI's claim and by failing to produce its claims

6

7    filed during discovery in this case.  (*See* Def. Mot. at 2-3, 23-25.)  Defendants provide no

     authority showing that either of these types of conduct constitutes bad faith, and the court

8

9    has located none.  Defendants cite *Sharbono v. Universal Underwriters Insurance Co.*,

10   161 P.3d 406 (Wash. Ct. App. 2007), for the proposition that an insurer's unreasonable

     refusal to share its claims file amounts to bad faith.  (*See* Def. Mot. at 23-24.)  In that

11

12   case, however, the insurer's refusal occurred in the context of the underlying litigation

     between the insured and the third-party claimant after the insured and the claimant

13

14   requested the claims file to aid in settlement.  *See Sharbono*, 161 P.3d at 411-12, 419-22.

     In the subsequent dispute between the insurer and the insured, the court of appeals

15

16   affirmed the trail court's summary judgment ruling that the insurer's earlier refusal had

     been unreasonable and in bad faith.  *See id.*  Here, however, the insurer's challenged

17

18   conduct occurred in the bad faith litigation (*see* Def. Mot. at 23), not in the underlying

     litigation.  Defendants offer no justification for extending *Sharbono* to this context, and

19

20   the court declines to do so.

21        With respect to their commingling claim, Defendants point to only the following

     evidence:  Cornhusker claims examiner Rebecca Messineo signed the reservation-of-

22

1    rights letter, Ms. Messineo stated in a 2010 email that she was assisting with coverage

2    issues on SQI's claim, and Cornhusker identified Ms. Messineo in discovery in this

3    matter as "Cornhusker's claims handler for SQI's defense." (*See* Def. Mot. at 3 & n.5

4    (citing RoR at 13; 2d Martens Decl. ¶ 2, Ex. 7; Corn. Disc. Resp. at 5).)  Defendants

5    provide no analysis or authority to show how this evidence indicates bad faith, and the

6    court finds Defendants' evidence insufficient to support the conclusion that Cornhusker

7    acted in bad faith. *See Scott*, 550 U.S. at 380.  Furthermore, in the only case to which

8    Defendants cite on this issue, the court ruled that assigning a single adjuster to defense

9    and coverage functions does not constitute to bad faith. *Am. Capital Homes, Inc. v.*

10   *Greenwich Ins. Co.*, No. C09-622-JCC, 2010 WL 3430495, at *5-6 (W.D. Wash. Aug.

11   30, 2010).  Accordingly, the court grants summary judgment against Defendants' claims

12   that Cornhusker's discovery abuses and commingling amount to bad faith.

13            *d.  Cornhusker did not violate the CPA*

14            A claim under the CPA requires proof of five elements:  "(1) [an] unfair or

15   deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact,

16   (4) injury to plaintiff in his or her business or property, [and] (5) causation." *Hangman*

17   *Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).  "A

18   violation of WAC 284-30-330 constitutes . . . a per se unfair trade practice[,]" thereby

19   satisfying the first element of a CPA violation. *Industrial Indem. Co. of Nw., Inc. v.*

20   *Kallevig*, 792 P.2d 520, 529 (Wash. 1990).  Defendants base their CPA claim on their

21   assertion that Cornhusker violated six provisions of WAC 284-30-330:

22

(1) Misrepresenting pertinent facts or insurance policy provisions, WAC 284-30-330(1);

(2) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies, WAC 284-30-330(3);

(3) Failing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted, WAC 284-30-330(5);

(4) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, WAC 284-30-330(6);

(5) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies, WAC 284-30-330(2); and

(6) Compelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings, WAC 284-30-330(7).

(Def. Mot. at 16-18.)  Cornhusker counters that it did not violate these provisions, and that even if it did, Defendants cannot show that any such violation caused injury to SQI's business or property.  (*See* Corn. Mot. at 21.)

        i.  *Misrepresentation, unreasonable investigation, failure to affirm or deny coverage within a reasonable time, and bad faith settlement conduct*

These alleged CPA violations overlap with four aspects of Defendants' bad faith claim.  *See supra* Part III.B.1.c.  Defendants cite no new evidence in this context, nor do they provide any authority or argument indicating that the court should evaluate the evidence differently in this context.  (*See* Def. Mot. at 17-19.)  As such, the court grants

ORDER- 33

1    summary judgment against these CPA claims for the reasons discussed above with

2    respect to the corresponding bad faith claims.  *See supra* Part III.B.1.c.

3              ii.   *Failure to acknowledge and act reasonably promptly upon*
                   *communications with respect to claims arising under insurance policies*

4        In support of this claim, Defendants offer an April 13, 2010, email exchange

5    between Cornhusker personnel.  (*See* Corn. Mot. at 17-18 (citing 2d Martens Decl. ¶ 2,

6    Ex. 17 ("4/13/10 Emails")).)  This exchange indicates that Cornhusker did not respond to

7    Ledcor's October 2007 tender letter or Ledcor's April 2008 invitation to mediation.  (*See*

8    4/13/10 Emails at 1 ("I don't see in the file where there were any responses to the

9    October 2007 letter or the April 23, 2008 letter.").)  Defendants do not explain how this

10   particular conduct injured SQI's business or property.  Instead, Defendants state

11   generally that all of "Cornhusker's unfair settlement practices and bad faith" forced SQI

12   to (a) hire personal counsel to settle the claims against it and (b) to agree to a covenant

13   judgment that has "impact[ed] SQI's reputation, good will, insurance rates, and

14   insurability."  (Def. Mot. at 16, 18-19 (citing 2d Gardner Decl. ¶¶ 2-9).)

15       Summary judgment is appropriate against this claim because Defendants fail to

16   create a genuine dispute of fact regarding causation.  *See Hangman Ridge Training*

17   *Stables, Inc.*, 719 P.2d at 533.  Defendants only evidence of injury to SQI's business or

18   property are the fees that Cornhusker paid to its private counsel and the impact of the

19   covenant judgment on SQI's business interests.  (*See* Def. Mot. at 16, 18-19 (citing 2d

20   Gardner Decl. ¶¶ 2-9).)  This evidence derives exclusively from Mr. Gardner's

21   declaration.  Yet neither Mr. Gardner's declaration nor any other evidence of which the

22

1    court is aware plausibly links Cornhusker's failure to respond to Ledcor's October 2007

2    and April 2008 letters to SQI's asserted injuries.  (*See* Gardner Decl. ¶¶ 2-9.)  After

3    receiving Ledcor's letters, Cornhusker hired defense counsel for SQI.  (*See* Messineo

4    Decl. ¶¶ 5-6, Ex. A; 2d Martens Decl. ¶ 2, Ex. 9; 4/08 Ledcor Letter.)  Defense counsel

5    attended at least four mediations over the next six years, including the mediation to which

6    Ledcor's April 2008 letter pertained.  *See supra* at 7-9.  SQI did not hire personal counsel

7    until just before the final mediation in March 2014 and did not settle with Ledcor and

8    Admiral until shortly after that mediation.  (*See* Def. Reply at 3-4; Stip. Judgment; 2d

9    Martens Decl. ¶ 2, Ex. 18; Hudson Letter at 1.)

10           Defendants offer no way for a reasonable fact-finder to trace Cornhusker's non-

11   response in October 2007 and April 2008 through six years of litigation, defense, and

12   mediation and find that non-response to have caused SQI to hire personal counsel and

13   agree to a covenant judgment.  Thus, even if Cornhusker violated WAC 284-30-330(2),

14   which the court does not decide, Defendants present insufficient evidence to show that

15   such violation caused injury to SQI's business or property.  *See Hangman Ridge Training*

16   *Stables, Inc.*, 719 P.2d at 533.  Accordingly, the court dismisses Defendants' CPA claim

17   concerning Cornhusker's alleged violation of WAC 284-30-330(2).

18                         iii.   *Compelling a first party claimant to initiate or submit to litigation to*
                                  *recover amounts due under an insurance policy by offering*
19                                *substantially less than the amounts ultimately recovered in such action*

20           This claim fails in light of the court's foregoing rulings.  Because Defendants have

21   failed to create a genuine dispute with respect to coverage, *see supra* Part III.B.1.b., they

22   cannot show that Cornhusker compelled SQI to submit to litigation by offering

1  substantially less in settlement than the amount ultimately recovered on the Policy in this

2  litigation.  *See* WAC 284-30-330(7).

3          *e.  Cornhusker did not violate IFCA*

4          IFCA establishes a cause of action for "[a]ny first party claimant to a policy of

5  insurance who is unreasonably denied a claim for coverage or a payment of benefits."

6  RCW 48.30.015(1).  Defendants appear to concede that Cornhusker has not "denied a

7  claim for coverage or a payment of benefits" in the traditional sense.  (*See* Def. Mot. at

8  21-23.)  They assert, however, that Cornhusker's alleged violations of the Washington

9  insurance regulations listed in subsection (5) of IFCA constitute a violation of IFCA, and

10  that Cornhusker denied payment of benefits within the meaning of IFCA when

11  Cornhusker offered an unreasonably low amount to settle the Contractor Suit.  (*Id.* (citing

12  *Langley v. Geico Gen. Ins. Co.*, --- F. Supp. 3d ---, 2015 WL 778619, at *6-7 (E.D.

13  Wash. 2015) (holding that an insured may maintain a cause of action under IFCA for a

14  violation of a Washington insurance regulation listed in subsection (5) of IFCA); *Morell

15  v. Safeco Ins. Co. of Ill.*, No. C12-0672JLR, 2013 WL 1562032, at *3 (W.D. Wash. Apr.

16  12, 2013) (holding that an unreasonably low settlement offer amounts to a denial of

17  benefits under IFCA))); *but see Seaway Props., LLC v. Fireman's Fund Ins. Co.*, 16 F.

18  Supp. 3d 1240, 1254-55 & n.5 (W.D. Wash. 2014) (holding that a violation of

19  Washington insurance regulations is not a violation of IFCA and collecting cases).  The

20  court need not decide the legal issues that Defendants raise because even if the court were

21  to side with Defendants on those issues, summary judgment would nevertheless be

22  appropriate against Defendants' IFCA claim.

1    The court turns first to Defendants' IFCA claim based on alleged violations of

2  Washington insurance regulations.  IFCA references the following regulations:

3       (a) WAC 284-30-330, captioned "specific unfair claims settlement
            practices defined";
4
         (b) WAC 284-30-350, captioned "misrepresentation of policy
5            provisions";

6        (c) WAC 284-30-360, captioned "failure to acknowledge pertinent
            communications";
7
         (d) WAC 284-30-370, captioned "standards for prompt investigation of
8            claims";

9        (e) WAC 284-30-380, captioned "standards for prompt, fair and
            equitable settlements applicable to all insurers"; or
10
         (f) An unfair claims settlement practice rule adopted under RCW
11           48.30.010 by the insurance commissioner intending to implement
             this section. The rule must be codified in chapter 284-30 of the
12           Washington Administrative Code.

13  RCW 48.30.015(5).  Defendants provide no additional facts or analysis supporting their

14  claim that Cornhusker violated IFCA by violating one of these regulations.  Instead,

15  Defendants state only that "the previously cited and discussed facts . . . establish as a

16  matter of law Cornhusker's violation of each of the regulations enumerated under [IFCA

17  subsection (5)]."  (Def. Mot. at 22.)  Thus, Defendants' regulation-based IFCA claim

18  merely repeats Defendants' other extra-contractual claims related to WAC provisions.

19  *See supra* Part III.B.1.b., c.  For the reasons discussed above with respect to those claims,

20  //

21  //

22  //

ORDER- 37

1  the court grants summary judgment in Cornhusker's favor on Defendants' regulation-

2  based IFCA claim.[18]

3         Defendants' claim that Cornhusker unreasonably denied payment of benefits

4  likewise must fail.  The court has already found that Defendants' have failed to raise a

5  genuine dispute regarding coverage and the reasonableness of Cornhusker's settlement

6  practices.  *See supra* Part III.B.1.b., c.ii.  Accordingly, Defendants cannot now maintain

7  an IFCA claim based on the notion that Cornhusker offered too little in settlement.  *See*

8  *Morell*, 2013 WL 1562032, at *3.  The court therefore dismisses Defendants' IFCA

9  claim.

10        2.  <u>Admiral's and Ledcor's Independent Counterclaims</u>

11         In addition to asserting counterclaims as SQI's assignees, both Admiral and

12  Ledcor have asserted their own counterclaims against Cornhusker for breach of contract,

13  violation of the CPA, and bad faith (Ledcor only).  (Admiral Ans. ¶ 4; Ledcor Ans. ¶ 4.)

14  These independent counterclaims rely on Defendants' contention that Admiral and

15  Ledcor are additional insureds under the policies that Cornhusker issued to SQI, and that

16  Cornhusker therefore should have indemnified Admiral and Ledcor in the ACOA Suit.

17  (*See id.*; Def. Resp. at 13-16.)  Cornhusker argues that the court should dismiss Admiral's

18  and Ledcor's counterclaims on several grounds, including that the extra-contractual

19

20      [18] To the extent the regulations enumerated in IFCA present distinct factual or legal

21  questions from those raised by Defendants' previous claims, the court finds that Defendants have
failed to meet their summary judgment burden of showing an IFCA violation because they have

22  not cited any facts or engaged in any analysis to demonstrate the merit of their claims to the court
or to Cornhusker.  *See Galen*, 477 F.3d at 658.

1    counterclaims are time barred.  (*See* Corn. Mot. at 21-27.)  The court agrees.  Admiral's

2    and Ledcor's contractual counterclaims fail because none of the subject policies provide

3    coverage[19] (*see* 3/30/15 Order); *supra* Part III.B.1.b., and their extra-contractual claims

4    are time barred.

5          Under Washington law, a cause of action for insurance bad faith has a three-year

6    statute of limitations.  *Moratti*, 254 P.3d at 942 (citing RCW 4.16.080; *Butler*, 823 P.3d at

7    503) (observing that Washington applies a three-year statute of limitations to tort claims

8    and that insurance bad faith sounds in tort).  A four-year statute of limitations applies to

9    CPA claims.  RCW 19.86.120.  These periods begin to run, at the latest, when the

10   putative insured settles with the underlying claimant.  *See Moratti*, 254 P.3d at 942;

11   *Walker v. Metropolitan Prop. & Cas. Ins. Co.*, No. C12-0173JLR, 2013 WL 942554, at

12   *3-5 (W.D. Wash. Mar. 8, 2013).  Ledcor and Admiral settled with ACOA in July 2009

13   (*see* Ledcor Ans. ¶ 3.9; Admiral Ans. ¶ 3.11), but asserted their present extra-contractual

14   counterclaims against Cornhusker five years later in their July 2014 answers to

15   Cornhusker's complaint (*see* Ledcor Ans. ¶ 4, at 14; Admiral Ans. ¶ 4, at 14).  Thus, even

16

17   ──────────────

18   [19] Ledcor also asserts that Cornhusker breached its duty to defend Ledcor (*see* Ledcor
     Ans. ¶ 4); however, Defendants do not dispute Cornhusker's assertions that (1) under the policies
19   Cornhusker had no duty to defend additional insureds until their imputed liability for SQI's
     conduct "exceeds the combined limits of other insurance or a $1 million [self-insured retention],
20   whichever is greater" (Corn. Mot. at 26-27 (citing 2d Sparling Decl. ¶¶ 2-3, Ex. A at 17, 23, Ex.
     B at 17, 23; Policy at 17, 23)), and (2) Defendants cannot show that Cornhusker's duty was
21   implicated in this case given that they stipulated to $747,785.00 as the amount of damage from
     SQI's work (*id.* at 27).  (*See* Def. Resp. at 15 (responding to this argument only by observing that
22   SQI was a primary insured under its policies with Cornhusker).)  As such, summary judgment is
     appropriate against Ledcor's counterclaim for breach of the duty to defend.

1  if Ledcor and Admiral qualify as additional insureds,[20] the statutes of limitations bar

2  Ledcor's and Admiral's independent extra-contractual counterclaims.

3        3.  <u>Defendants' Counterclaims for Reformation</u>

4        All three Defendants assert the following counterclaim in their answers:

5  > To the extent the Court determines that the actual coverage provided under
6  > the Cornhusker's [sic] policies did not comply with the requirements and
   > intent of the parties to the subcontract between Ledcor and SQI that SQI's
7  > liability insurance should defend and indemnify SQI, Ledcor, and Admiral
   > Way for any and all claims for property damages and consequential damage
8  > arising out of or connected with SQI's work on the Admiral Way Mixed-
   > Use on a primary basis, said policies should be reformed.

9  (SQI Ans. ¶ 5.1; Admiral Ans. ¶ 5.1; Ledcor Ans. ¶ 5.1.)  Defendants argue for dismissal

10  of these counterclaims on the bases that (1) Defendants lack evidence to merit

11  reformation, and (2) the intent of parties to a separate contract—the subcontract between

12  SQI and Ledcor—is irrelevant to whether Cornhusker's contracts (policies) with SQI

13  should be reformed.  (*See* Corn. Mot. at 27-28.)  Faced with this argument, Defendants

14  reinterpret their reformation claims as requesting that the court give effect to the so-called

15  "repairs exception" to the Policy's residential construction exclusion.  (*See* Def. Resp. at

16  16-17.)

17        Cornhusker is entitled to summary judgment against Defendants' reformation

18  counterclaims.   "Reformation is an equitable remedy employed to bring a writing that is

19  materially at variance with the parties' agreement into conformity with that agreement."

20  *Denaxas v. Sandstone Ct. of Bellevue, L.L.C.*, 63 P.3d 125, 132 (Wash. 2003) (citing

21

22      [20] The court expresses no opinion on this subject.

ORDER- 40

1 | *Akers v. Sinclair*, 226 P.2d 225 (Wash. 1950)).  "A party may seek reformation of a

2 | contract if (1) the parties made a mutual mistake or (2) one of them made a mistake and

3 | the other engaged in inequitable conduct."  *Id.* (citing *Wash. Mut. Sav. Bank v. Hedreen*,

4 | 886 P.2d 1121 (Wash. 1994)).  "The party seeking reformation must prove the facts

5 | supporting it by clear, cogent and convincing evidence."  *Id.* (citing *Akers*, 226 P.2d 225;

6 | *Kaufmann v. Woodard*, 163 P.2d 606 (Wash. 1945)).  Defendants point to no evidence

7 | that Cornhusker and SQI shared a mutual mistake or that SQI made a mistake and

8 | Cornhusker engaged in inequitable conduct during the formation of their contracts.

9 | Furthermore, Defendants offer no legal authority for the proposition that the intent of SQI

10 | and Ledcor in forming their subcontract is relevant to whether reformation is appropriate

11 | with respect to SQI's separate contracts with Cornhusker.  Accordingly, the court grants

12 | summary judgment in favor of Cornhusker on Defendants' counterclaims for

13 | reformation.

14 | //

15 | //

16 | //

17 | //

18 | //

19 | //

20 | //

21 | //

22 | //

ORDER- 41

## IV.   CONCLUSION

For the foregoing reasons, the court DENIES Defendants' motion, GRANTS Cornhusker's motion, DECLARES that SQI's policies with Cornhusker provide no coverage for the losses at issue in the Contractor Suit, DISMISSES Defendants' counterclaims, and DENIES as moot the pending motions in limine (Dkt. ## 93, 94).

Dated this 21st day of September, 2015.


_____
JAMES L. ROBART
United States District Judge

ORDER- 42